**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                               :

SCOTT EDELGLASS, et al.           :

                               :

              Plaintiffs,    :

                               :     Civil Action No. 14-760 (FLW)(DEA)

     v.                       :

                               :     **OPINION**

STATE OF NEW JERSEY, et al.,   :

                               :

              Defendant(s).   :

_____  :

**<u>WOLFSON</u>, <u>United States District Judge</u>**:

      This actions arises out of a three-Count Amended Complaint filed by Plaintiffs Scott Edelglass ("Edelglass"), Samir Joshi ("Joshi"), Yehuda Ben Litton ("Litton"), Surender Malhan ("Malhan"), Antonio Quinlan ("Quinlan"), and Werner Graf ("Graf") (collectively "Plaintiffs"), on their own behalf, on behalf of their respective children, and on behalf of all others similarly situated. Plaintiffs, suing under 42 U.S.C. § 1983, allege constitutional infirmities in the State of New Jersey's procedures for handling custody disputes between parents. Specifically, Plaintiffs claim: (Count 1) that they have been deprived of fundamental rights without due process; (Count 2) that the use of the "best interests" standard is unconstitutional when used to deprive parents of fundamental rights; and (Count 3) that the State of New Jersey treats mothers and fathers differently, and treats indigent parents who lose custody of their children to the state differently from indigent parents who lose custody of their children to another parent, in violation of equal protection.

      Defendants the State of New Jersey ("State"); Michelle M. Smith in her official capacity as Clerk of the Superior Court of New Jersey; John L. Call, Jr. in his official capacity as the

Presiding Judge of the Chancery Division, Family Part of Burlington County; Maureen

Sogluizzo in her official capacity as Presiding Judge of the Chancery Division, Family Part of

Hudson County; Catherine Fitzpatrick in her official capacity as Presiding Judge of the Chancery

Division, Family Part of Mercer County; Lisa Thornton in her official capacity as Presiding

Judge of the Chancery Division, Family Part of Monmouth County; and Patricia B. Roe in her

official capacity as Presiding Judge of the Chancery Division, Family Part of Ocean County

(collectively "Defendants"; Smith, Call, Sogluizzo, Fitzpatrick, Thornton and Roe collectively

"individual Defendants"; Call, Sogluizzo, Fitzpatrick, Thornton and Roe collectively "Jurist

Defendants"), filed a motion to dismiss the Amended Complaint on the basis that the court lacks

jurisdiction under the *Rooker-Feldman* doctrine, the domestic relations exception, and under the

*Younger* abstention doctrine; that most of Plaintiffs' claims are barred by the statute of

limitations; that Plaintiffs lack standing to bring claims for injunctive relief; that Defendants

have sovereign immunity or are not persons within the meaning of 42 U.S.C. § 1983; that

Plaintiffs claims are improperly brought on a theory of *respondeat superior*; that the Jurist

Defendants have absolute immunity; and that all Defendants are entitled to qualified immunity.

     For the reasons that follow, the motion to dismiss is granted. Specifically, all claims

against the State of New Jersey and all damages claims against the individual Defendants are

dismissed as barred by the Eleventh Amendment. All of the Plaintiffs' claims against the

individual Defendants are dismissed, without prejudice, because, as pleaded, they are based on a

theory of *respondeat superior*, and therefore fail to state a claim under § 1983. Certain of the

Plaintiffs' individual claims are also dismissed with prejudice: (1) all of Plaintiff Edelglass's

claims are dismissed for lack of standing and as barred by the statute of limitations; (2) all of

Plaintiff Graf's claims are dismissed as barred by the statute of limitations; (3) all of Plaintiff

Litton's claims are dismissed as barred by the statute of limitations; (4) Plaintiff Malhan's claims regarding his custody hearings are dismissed as barred by the statute of limitations; and (5) Plaintiff Quinlan's claims are dismissed as barred by the statute of limitations.

The following claims are dismissed without prejudice: (1) Plaintiff Joshi's claims regarding his custody hearings in Burlington County, (2) Plaintiff Malhan's claims regarding his "gag order," in Essex County, and (3) Plaintiff Quinlan's claims regarding his weapons order in Hudson County.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

For the purposes of this motion to dismiss, the following facts, taken from the Plaintiffs' Amended Complaint, are assumed to be true. Plaintiffs are all divorced or single fathers who lost custody of their children for at least some period of time. I will briefly describe the facts of each Plaintiff's case.

Scott Edelglass, who resides in Ocean County, is the father of Z.E., who was born in 1994. Am. Compl. at ¶¶ 3, 12. Shortly after Z.E.'s birth, Edelglass petitioned Monmouth County Court for custody; the outcome of that petition is unclear. *Id.* at ¶ 12. However, in 1997, Z.E.'s mother, Erin Fisher, was granted sole custody of Z.E. by the Monmouth County Family Court, and Edelglass was permitted supervised visitation. *Id.* at ¶ 13. Edelglass asserts that he "was not permitted a full opportunity to present evidence or challenge the evidence against him." *Id.* at ¶ 14. In 1998, Edelglass petitioned the court for unsupervised visitation, which was denied without a plenary hearing. *Id.* ¶ 15. In March 2006, Edelglass requested a hearing on his visitation; again the outcome of the request is unclear. *Id.* at ¶ 17. Although Z.E., who is no longer a minor, can

now see Edelglass on his own, Edelgass asserts that there was "significant and long-lasting damage to [sic] father-son relationship." *Id.* at ¶ 18.

Werner Graf, a resident of Mercer County, has two children, born in 2004 and 2008, with Lisa Graf, née McComb ("McComb"). *Id.* at ¶¶ 4, 19. On January 9, 2012, McComb filed for an ex parte temporary restraining order ("TRO"), claiming domestic violence. *Id.* at ¶ 20. Graf asserts that the allegations were exaggerated, and that a single instance of corporal punishment was incorrectly included in the testimony. *Id.* at ¶¶ 23–23. The TRO granted full temporary custody to McComb, and denied any and all parenting time, visitations, or contact for Graf and his family. *Id.* at ¶ 24. The hearing for a final restraining order was delayed until May 3 and 10, 2012. *Id.* at ¶ 28. On February 10, 2012, the TRO was amended to permit ten hours of custody time; on March 22, the TRO was amended to permit parenting time every other weekend, subject to the availability of supervisors approved by the court. *Id.* at ¶¶ 28–29. The TRO was dismissed with prejudice in August, 2012, and a 50-50 custody arrangement was agreed upon in September 2012. *Id.* at ¶¶ 33–34. Graf asserts that the nine-month denial of his parental rights, based on McComb's bald allegations, "has likely damaged the father-child relationship." *Id.* at 36–37.

Plaintiff Joshi, who resides in Pennsylvania, is the father of three children, ages 14, 12, and 10. *Id.* at ¶ 6. He and his ex-wife, Christine, filed for divorce in Pennsylvania, but in 2012, Christine asked New Jersey to take jurisdiction. *Id.* at ¶ 38. On or about June 22, 2012, Christine filed an Order to Show Cause in Burlington County Superior Court, with a return date for July 12, 2012. *Id.* at ¶ 39. Joshi allegedly was not properly served, and did not have notice until shortly before the hearing; a request for a continuance was apparently denied. *Id.* at 39–40. On July 12, Joshi appeared telephonically. *Id.* at ¶ 41. He was not permitted to cross-examine Christine, and did not have time to prepare evidence or obtain counsel. *Id.* at ¶ 42. The Superior

Court ordered Joshi to hand over physical custody of the children that day. *Id.* at ¶ 43. Joshi requested a revision of the order to give him full and equal custody; on December 4, without a plenary hearing, the Superior Court modified the earlier order to permit supervised visitation. *Id.* at ¶ 44. In the summer of 2013, Joshi again requested full and equal custody, and requested a plenary hearing; the request for a hearing was denied, and Joshi was granted limited parenting time of 14 hours per week. *Id.* at ¶ 45. Joshi asserts that the Superior Court's restrictions on his ability to parent "likely have caused significant and long-lasting damage to [sic] father-child relationship." *Id.* at ¶ 47.

Litton, a resident of Ocean County, is the father of a son, L., born in 1998. *Id.* at ¶¶ 5, 48. Litton and his ex-wife, Linda, were divorced in January 2008, in Monmouth County; the Judgment of Divorce provided for a 50-50 custody split. *Id.* at 49. Linda denied Litton time with his son; following a transfer of jurisdiction to Ocean County, Litton requested that the Ocean County Court enforce the 50-50 custody arrangement. *Id.* Following an *in camera* interview of Litton's son, the court suspended Litton's parenting time indefinitely on May 8, 2008. *Id.* at ¶¶ 50, 52. Some, but not all, of the allegations were made known to Litton, but have not been described to this Court. *Id.* at ¶ 51. No plenary hearing was held. *Id.* at ¶ 53. In March 2010, however, the Superior Court conducted a full hearing and issued a new order, permitting Litton to see his son for a few hours per week; this Order concluded that Linda had "substantially poisoned L[]'s perception of [Litton], thereby causing L[] to reject his father." *Id.* at ¶¶ 54–55 (alterations in original). Litton alleges the restrictions on his ability to see his son likely caused significant and long-lasting damage to the father-child relationship. *Id.* at ¶ 59.

Malhan, a resident of Hudson County, is the father of two children, ages seven and four. *Id.* at ¶ 7. On February 24, 2011, Alina Myronova, the mother of Malhan's children, filed an

Order to Show Cause in Hudson County Superior Court, Family Part, requesting full physical and legal custody. *Id.* at ¶ 60. Malhan had less than two hours' notice of the proceeding, and contested the allegations regarding his lack of fitness to parent. *Id.* at ¶ 62. The court did not permit Malhan to present any evidence, nor did the court order Myronova to produce evidence which Malhan alleged would prove that she was lying. *Id.* at ¶¶ 63–64. On February 24, 2011, Malhan was stripped of physical and legal custody, and permitted one hour per week of supervised visitation at the Hudson County Courthouse. *Id.* at ¶¶ 65–66. According to the Amended Complaint, the Hudson County Family Court "set a further return date of April 1, 2011"; at a hearing on that date, Malhan was again not permitted to cross-examine Myronova. *Id.* at ¶ 68. Myronova retained sole legal and physical custody of the children until June 2012, when she agreed to joint custody. *Id.* at ¶ 69. Ultimately, the Hudson County Family Court also ruled that Myronova's objections to Malhan's taking care of the children was without basis. *Id.* at ¶ 70.

Following the filing of the present suit, Malhan and two other plaintiffs were interviewed by a local television station on February 18, 2014. *Id.* at ¶ 72. On April 4, 2014,[1] the Essex County Superior Court, Family Part, issued a "gag order," which restrained Malhan from discussing any issues surrounding the divorce of custody proceedings with any member of the media, from posting anything regarding this issues on the Internet, and from discussing any aspect of the divorce with his children. *Id.* at ¶¶ 73–74. The court did not hold a plenary hearing, and made no findings specific to Malhan or his children, but found that publicity about divorce proceedings was not in the best interests of the children. *Id.* at ¶ 75.

---

[1] The Amended Complaint gives the date of the "gag order" as February 4, 2014. However, Malhan's previous Motion for Temporary Restraining Order, filed May 6, 2014, provided the correct date.

Quinlan, a resident of Hudson County, has a thirteen year old child. *Id.* at ¶¶ 8, 80. On December 3, 2010, the Hudson County Superior Court, Family Part, held a hearing on a motion filed by Quinlan's ex-wife, Kayoi Quinlan Hasabe. *Id.* at ¶ 81. Quinlan was not permitted to testify, present evidence, or cross-examine Hasebe, and the court allegedly relied on hearsay evidence and Hasebe's certifications. *Id.* at ¶¶ 82–84. The Superior Court terminated Quinlan's legal custody of his child. *Id.* at ¶ 80. Quinlan further alleges that through an administrative error, the State of New Jersey has entered an Order in a national database that indicates that Quinlan is subject to a Restraining Order preventing him from having contact with his child, and that the State has refused to correct this error. *Id.* at ¶¶ 86–87. In addition, Quinlan alleges that a conflict of interest occurred during the pendency of the underlying litigation, and that the Superior Court refused to address it. *Id.* at ¶ 89. Finally, Quinlan asserts that the Superior Court has ordered him not to possess any weapons, again without a hearing or any showing that Quinlan's possession of weapons presented a danger. *Id* at ¶ 90.

Plaintiffs filed their initial complaint against Defendants, plus Burlington, Hudson, and Ocean Counties, on February 5, 2014. The First Amended Complaint, which did not list the Counties as defendants, was filed on April 14, 2014; the Counties were terminated as defendants on August 20, 2014. On May 6, 2014, Plaintiff Malhan filed a Motion for a Temporary Restraining Order to enjoin enforcement of the "gag order"; this Motion was denied on May 8th, 2014, for lack of jurisdiction. Defendants then filed the present Motion to Dismiss the First Amended Complaint with Prejudice.

## II. STANDARD OF REVIEW

In the instant matter, State Defendants move to dismiss Plaintiffs' Amended Complaint for lack of subject matter jurisdiction under the Federal Rules of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). When a Rule 12 motion "is based on more than one ground, the court should consider the 12(b)(1) challenge first, because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." *In re Corestates Trust Fee Litig.*, 837 F. Supp. 104, 105 (E.D. Pa. 1993).

### A. Rule 12(b)(1)

A defendant may move to dismiss a claim for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). There is no presumption of truthfulness that attaches to the allegations of the complaint when determining a challenge to the court's subject matter jurisdiction. *Mortensen v. First Federal Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Once a 12(b)(1) challenge is raised, the plaintiff bears the burden of demonstrating the existence of subject matter jurisdiction. *See McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006). A Rule 12(b)(1) motion to dismiss is treated as either a "facial or factual challenge to the court's subject matter jurisdiction." *Gould Electronics, Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). Under a facial attack, the movant challenges the legal sufficiency of the claim, and the court considers only "the allegations of the complaint and documents referenced therein and attached thereto in the light most favorable to the plaintiff." *Id.* Under a factual attack, however, "the challenge is to the actual alleged jurisdictional facts." *Liafom, LLC. v. Big Fresh Pictures*, Civ. No. 10-0606, 2011 U.S. Dist. LEXIS 95251, 2011 WL 3841323 (D.N.J. Aug. 24, 2011).

A factual attack may be made at any time after the answer has been filed. *Mortensen*, 549 F.2d at 891, 891 n.17 ("A factual jurisdictional proceeding cannot occur until plaintiff's

allegations have been controverted."). Because Defendants have not filed an answer in this case, their 12(b)(1) motions, namely sovereign immunity, prudential standing requirements, and the *Rooker-Feldman* doctrine, *see* Def. Br. at 11, as well as other abstention doctrines including *Younger* abstention and the domestic-relations exception, must be treated as facial attacks. *See Constitution Party of Penn. v. Aichele*, 757 F. 3d 347, 358 (3d. Cir. 2014) (stating that because attack was filed before any answer to the complaint, motion was "by definition, a facial attack."). Thus, all allegations in the Complaint must be treated as true for the purposes of these issues.

**B. Rule 12(b)(6)**

Under Rule 12(b)(6), a court may dismiss a claim for failing to state a basis upon which relief can be granted. Affirmative defenses, such as a statute of limitations, may be raised in a Rule 12(b)(6) motion so long as "the predicate establishing the defense is apparent from the face of the complaint." *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 n.10 (3d Cir. 1978). In deciding a Rule 12(b)(6) motion, "courts are required to accept all well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of the non-moving party." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008). However, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The pleading must contain more than "labels and conclusions or a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555) (internal citations and quotations omitted). Thus, a complaint will survive a motion to dismiss if it contains "sufficient factual matter, as accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570) (internal citations and quotations omitted). "A claim has

facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Assertions of judicial and qualified immunity, as affirmative defenses which raise "insuperable barriers" to claims, *see Flight Sys., Inc. v. Elec. Data Sys.*, 112 F.3d 124, 127 (3d. Cir. 1997), are analyzed under Rule 12(b)(6). *See, e.g.*, *Green v. Maraio*, 722 F.2d 1013, 1015–19 (3d Cir. 1983). Defendants' motions based upon the statute of limitations, absolute immunity, and qualified immunity, in addition to Defendants assertion that Plaintiffs have failed to state a claim under § 1983 because Plaintiffs' claims are based on a theory of *respondeat superior*, will be discussed under this Rule.

## III. DISCUSSION

### A. The *Rooker-Feldman* Doctrine

Defendants assert that Plaintiff's Complaint improperly attempts to appeal concluded and pending State court proceedings, namely their final or ongoing divorce and custody proceedings. Def. Br. at 14. Defendants argue, therefore, that this Court lacks jurisdiction to hear this case under the *Rooker-Feldman* doctrine. Def. Br. at 14. This doctrine prohibits a district court from exercising federal subject matter jurisdiction in cases "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *ExxonMobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005). Defendants note that *Rooker-Feldman* applies "event when federal constitutional issues are at stake." Def. Br. at 14. Plaintiffs argue that this case does not fall within the boundaries of the *Rooker-Feldman* doctrine, because while a federal court may not review a state court decision, it can hear a challenge to a statute or

rule underlying that decision. Pl. Br. at 11. Plaintiffs also argue that *Rooker-Feldman* does not apply to prospective relief, *id.* at 23, and that the minors on whose behalf the present suit was brought, namely the children of the named Plaintiffs, were not parties to any of the state proceedings, *id.* at 24.

The *Rooker-Feldman* doctrine takes its name from two United States Supreme Court cases. In the first, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), parties who were defeated in state court requested a federal District Court to declare the state-court judgment "null and void" because it was allegedly "rendered and affirmed in contravention of the Constitution." *Id.* at 414–15. Construing the jurisdictional statutes, 28 U.S.C. § 1331 and 28 U.S.C. 1257, and after finding the state court had jurisdiction, the Supreme Court held that only the Supreme Court "could entertain a proceeding to reverse or modify the judgment for errors of that character." *Id.* at 415–16.  In the second case, *District of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983),  the Plaintiffs had petitioned District of Columbia Court of Appeals to waive a bar admission rule; upon the denial of their petitions, the Plaintiffs each filed complaints in in the District Court for the District of Columbia. *Exxon-Mobil*, 544 U.S. at 285. The Supreme Court held that the Plaintiffs' charge that the District of Columbia court had acted arbitrarily in denying the waiver was not reviewable because "it was "inextricably intertwined with the District of Columbia Court of Appeals' decisions, in judicial proceedings, to deny [plaintiffs'] petitions." *Id.* However, the District Court could review the Plaintiffs' claim that the bar admission rule itself was unconstitutional. *Id.*

The Supreme Court emphasized the narrow applicability of *Rooker-Feldman* in 2005, in *ExxonMobil Corp. v. Saudi Basic Industries Corp.* Saudi Basic Industries Corp. ("SABIC") had sued Exxon in state court over a royalties dispute; Exxon had countersued in the District of New

Jersey. 544 U.S. at 289. In state court, Exxon asserted as counterclaims the same claims it had brought in the federal suit. *Id.* SABIC had moved to dismiss the federal suit; the motion was denied and SABIC appealed—after a state trial had already been completed. *Id.* at 289–90. Rejecting reliance on a broad "intextricably intertwined" test, the Supreme Court held that the *Rooker–Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284.

The narrow ground of *Rooker-Feldman* was further emphasized most recently in *Skinner v. Switzer*, 562 U.S. 521 (2011). Skinner, a convicted murderer sentenced to death, attempted to get DNA evidence tested by bringing a § 1983 challenge to the Texas rule barring such testing. *Id.* at 1295. Skinner had twice moved in state court for the evidence to be tested, and was denied both times. *Id.* The Supreme Court permitted the federal suit, stating that "'[i]f a federal plaintiff present[s][an] independent claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court.'" *Id.* at 1297 (quoting *ExxonMobil*, 544 U.S. at 292–93) (some alterations in original). Jurisdiction was permitted because "Skinner does not challenge the adverse [state court] decisions themselves; instead, he targets as unconstitutional the Texas statute they authoritatively construed." *Id.* at 1298.

Following *ExxonMobil*, the Third Circuit reevaluated its prior holdings on the *Rooker-Feldman* doctrine. In *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, Great Western Mining and Mineral Company had filed a civil rights action asserting that it lost a case in Pennsylvania state court because of a "'corrupt conspiracy' between the named defendants

and certain members of the Pennsylvania state judiciary to exchange favorable rulings for future employment as arbitrators with . . . an alternative dispute resolution entity." 615 F.3d 159, 160 (3d Cir. 2010). The Third Circuit concluded that *Rooker-Feldman* did not apply. *Id.* Looking to *ExxonMobil*, the panel found four requirements for the application of the doctrine: "(1) the federal plaintiff lost in state court; (2) the plaintiff 'complain[s] of injuries caused by [the] state-court judgments'; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." *Id.* at 166 (alteration in original). The panel observed, however, that the question of whether an injury is "caused by" a state court judgment "becomes more complicated when a federal plaintiff complains of an injury that is in some fashion related to a state-court proceeding," because "a federal plaintiff who was injured by a state-court judgment is not invariably seeking review and rejection of that judgment." *Id.* at 167–68. The panel determined that the claim that "Great Western was purportedly forced to litigate in a rigged system and could not receive a fair hearing in Pennsylvania against ADR Options and Rutter, in violation of its constitutional rights" did not "assert injury caused by state-court judgments and seek review and rejection of those judgments." *Id.* at 171 (internal quotation marks omitted). Thus, the panel concluded "Great Western may, 'as part of [its] claim for damages,' show 'that the [constitutional] violation caused the decision[s] to be adverse to [it] and thus did [it] harm.' A finding by the District Court that state-court decisions were erroneous and thus injured Great Western would not result in overruling the judgments of the Pennsylvania courts." *Id.* at 173 (alterations in original)(citation omitted).

Most recently, in a case strikingly similar to the current one, the Third Circuit held that *Rooker-Feldman* did not bar a suit for violation of substantive and procedural due process. *B.S.*

*v. Somerset Cnty.*, 704 F.3d 250 (3d Cir. 2013). Following allegations of physical neglect, the Somerset County Children and Youth Services obtained an order, ex parte, from a Pennsylvania state court judge transferring a daughter from her mother's custody, to her father. *Id.* at 255. Under Pennsylvania law, no hearing was required because the custody was transferred to another parent, not to the state. *Id.* 256. The mother sued the County and two of its employees for violating her rights to substantive and procedural due process. *Id.* at 259. The Third Circuit held that *Rooker-Feldman* did not apply because "the injury Mother claims is . . . traceable to Appellees' actions, as opposed to the state court orders those actions allegedly caused." *Id.* at 260.

Applying the *Great Western* four-part test to the case at hand, *Rooker-Feldman* does not apply to the claims presented in this case regarding custody hearings. On the first prong, whether the federal plaintiff lost in state court, the answer is not entirely clear. Certainly the Plaintiffs initially lost in state court; however, in at least some of the cases, the Plaintiffs succeeded in getting those decisions reversed, in whole or in part. Furthermore, as Plaintiffs point out, to the extent that the suit also brings claims on behalf of the Plaintiffs' minor children, the children were not parties to the initial state actions. More importantly, as to the second prong, as defined by *Great Western*, the plaintiffs do not complain of injuries caused by the state-court judgments. Rather, as in *Great Western*, they complain that they were "forced to litigate in a rigged system." 615 F.3d at 171. Like the litigants in *Skinner*, the Plaintiffs are not challenging the state court judgments, but the underlying policy that governed those judgments—namely, the alleged policy of the New Jersey State Courts of stripping parents of custody, in favor of another parent, without a plenary hearing. *See Skinner*, 562 U.S. at 1298; *see also B.S.*, 704 F.3d at 260. For the same reason, it cannot be said, under the fourth prong, that the plaintiff is inviting the district

court to review and reject the state judgments. The fact that, under the third prong, some of the judgments were rendered before the federal suit was filed is largely immaterial here.

In addition to the custody assertions, Plaintiff Malhan asserts that he was subject to a "gag order" without due process; similarly, Plaintiff Quinlan asserts that he is subject to an order "not to possess any weapons" that was issued without any type of hearing, and that he is harmed by an administrative error which incorrectly shows that he is subject to a restraining order. These claims, too, are subject to the four-prong *Great Western* test. Here, the Plaintiffs lost in state court. However, like the custody claim, Malhan and Quinlan do not claim that they suffered injury directly from the orders; rather, they claim that the system was rigged—that each was respectively deprived of his "First and Second Amendment rights under color of law under the theory that 'best interests of the child' trump any and all fundamental rights, and . . . without a plenary hearing or specific findings." Am. Comp. at ¶ 116. Similarly, the Plaintiffs are not inviting review and rejections of the orders themselves, but of the process used to issue them.

For these reasons, Defendants' argument that this case should be dismissed pursuant to the *Rooker-Feldman* doctrine must be denied.

## B. The Domestic Relations Exception

Defendants next argue that this Court does not have subject matter jurisdiction under the domestic relations exception to federal jurisdiction. Def. Br. at 18. According to Defendants, the domestic relations exception applies because Plaintiffs' claims "implicate the Family Part's special expertise in dealing with child custody in family law disputes," and would require this Court to "make determinations about child custody proceedings and State family law." *Id.* at 20. Plaintiff, however, asserts that in the Third Circuit, the domestic relations exception applies only to cases brought under diversity jurisdiction. Pl. Br. at 27.

The domestic relations exception to federal diversity jurisdiction was first raised in *Barber v. Barber*, 21 How. 582, 16 L. Ed. 226 (1859). In 1992, the Supreme Court explained that the domestic relations exception, as applied by the federal courts since *Barber*, "divests the federal courts of power to issue divorce, alimony, and child custody decrees." *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992). More recently, the Supreme Court acknowledged that "it might be appropriate for the federal courts to decline to hear a case involving elements of the domestic relationship, even when divorce, alimony, or child custody is not strictly at issue: This would be so when a case presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 13 (2004) (internal quotation marks and citations omitted). However, the Supreme Court further stated that "rare instances arise in which it is necessary to answer a substantial federal question that transcends or exists apart from the family law issue, *see, e.g.*, *Palmore v. Sidoti*, 466 U.S. 429, 432–434, (1984), [though] in general it is appropriate for the federal courts to leave delicate issues of domestic relations to the state courts." *Id.*

There is a split among the Circuit Courts of Appeal as to whether the domestic relations exception applies only to cases brought under diversity jurisdiction or to any case that would otherwise have federal subject matter jurisdiction. *See* Meredith Johnson Harbach, *Is the Family a Federal Question?*, 66 Wash. & Lee. L. Rev. 131, 147 (2009) (noting circuit split and listing cases). However, the Third Circuit has limited the domestic relations exception to diversity: "'as a jurisdictional bar, the domestic relations exception does not apply to cases arising under the Constitution or laws of the United States.'" *McLaughlin v. Pernsley*, 876 F.2d 308, 312 (3d Cir. 1989) (quoting *Flood v. Braaten*, 727 F.2d 303, 308 (3d Cir. 1984)).

16

Accordingly, since this case is brought under federal question jurisdiction, raising constitutional claims under § 1983, the domestic relations exception does not apply.

### C. *Younger* Abstention

Defendants assert that this Court should decline jurisdiction under the *Younger* abstention doctrine, which requires federal court abstention from ongoing state court proceedings or where a plaintiff failed to exhaust his state remedies. Def. Br. at 21–22. Defendants claim that abstention is proper here because the New Jersey State courts have continuing jurisdiction over Plaintiffs' ongoing child custody and divorce proceedings. *Id.* at 22. Additionally, Defendants assert that the state's administration of its child custody and domestic relations law is an important state interest. *Id.* at 24. Defendants further assert that the Plaintiffs failed to avail themselves of the state appeals process, and that there is no evidence of bad faith, harassment, or other extraordinary circumstances. *Id.* at 25–26. Plaintiffs assert that *Younger* abstention does not apply, as this case does not involve a criminal prosecution, a civil enforcement action, or a civil proceeding uniquely in furtherance of the state courts' ability to perform their judicial functions. Pl. Br. at 30–31.

*Younger* abstention derives its name from *Younger v. Harris*, 401 U.S. 37 (1971). In that case, the plaintiff, who had been charged under the California Criminal Syndicalism Act, filed suit in federal district court requesting that his prosecution to be enjoined because the law was unconstitutional. *Id.* at 41. The Supreme Court cited 28 U.S.C. § 2283, which generally prevents a federal court from staying proceedings in a state court.[2] *Id.* at 43. Underlying this policy, the Supreme Court declared, was "the basic doctrine of equity jurisprudence that courts of equity

---

[2] Specifically, § 2283 states: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Id.* at 43–44. The Supreme Court held that "the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Id.* at 45. Thus, because the plaintiff there was faced with an injury "incidental to every criminal proceeding brought lawfully and in good faith" he was "not entitled to equitable relief even if such statutes are unconstitutional." *Id.* at 49 (internal quotation marks omitted).There are, however, exceptions to *Younger* abstention for bad faith and harassment *Id.* at 53. Similarly, in the unusual case of a statute which is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it," abstention would not be warranted. *Id.* at 53–54.

More recently, the Supreme Court expanded the *Younger* abstention doctrine to two categories of cases, in addition to ongoing criminal prosecutions: "certain 'civil enforcement proceedings,'"; and "pending "civil proceedings involving certain orders ... uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013). Such civil enforcement proceedings include, for example "a civil action in state court to abate the showing of obscene movies which was in aid of and closely related to [the State's] criminal statutes." *Id.* (citing *Huffman v. Pursue*, Ltd., 420 U.S. 592 (1975)). Civil proceedings in furtherance of a state court's ability to perform judicial functions are exemplified by contempt orders. *See Juidice v. Vail*, 430 U.S. 327 (1977). Thus, in 2013, the Supreme Court clearly limited *Younger* abstention to the above delineated three categories. *Sprint*, 134 S. Ct. at 591. According to the Supreme Court, "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *Id.*

18

(internal alterations quotation marks, and citation omitted). "In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction. Abstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Id.* at 588.

In *Sprint*, the Supreme Court expressly restrained the Circuit Courts of Appeals' reliance on its previous decision in *Middlesex Cnty. Ethics Comm. v. Garden State Bar Assoc.*, 457 U.S. 423 (1982). That decision had been interpreted as warranting *Younger* abstention if three conditions were met: "(1) "an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) . . . provide[s] an adequate opportunity to raise [federal] challenges." *Sprint*, 134 S. Ct. at 593. The Supreme Court stated that these conditions were "not dispositive" but were "*additional* factors appropriately considered by the federal court before invoking *Younger*." *Id.* The Supreme Court warned that "[d]ivorced from their quasi-criminal context [bar disciplinary proceedings], the three *Middlesex* conditions would extend Younger to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest," and accordingly limited *Younger* abstention to the three circumstances identified above. *Id.*

The Family Court proceedings underlying the present case do not fall under any of the three categories delineated by the Supreme Court in *Sprint*.[3] The same is true of the "gag order" against Malhan, the order not to possess weapons against Quinlan, and the allegedly erroneous record showing a restraining order against Quinlan. These proceedings were not criminal proceedings. Nor were they civil enforcement proceedings, as there was no claim that Plaintiffs

---

[3] Indeed, in neither the original brief nor the reply brief did Defendants' counsel cite *Sprint* or any cases following *Sprint*, choosing instead to rely on the three *Middlesex* factors which were expressly repudiated as dispositive by the Supreme Court. This omission is striking, as Plaintiffs' counsel pointed out that the cases in Defendants' original brief had been at least called into question by *Sprint*. *See* Pl. Br. at 30.

violated any civil statute. Finally, the Family Court proceedings and orders at issue here are not analogous to contempt hearings, and therefore do not fall into the category of proceedings which further the state's ability to perform judicial functions. As the case does not fall into any of the "exceptional" categories to which *Younger* abstention applies, Defendants' motion to dismiss the case on this ground is denied.

### D. Standing

Defendants argue that Plaintiffs lack standing to bring claims for injunctive relief on behalf of "presumed future plaintiffs." Def. Br. at 27. According to Defendants, Plaintiffs' claim relies on the speculative assertion that the New Jersey Family Part courts will not provide due process or equal protection to future fathers in child-custody actions. *Id.* at 29. To the extent that Plaintiffs seek relief in their own cases, Defendants assert that such claims are moot because any constitutional violations resulting from court orders were cured by subsequent orders amending the child custody arrangements, or because the child reached the age of majority. *Id.* at 29–30. Plaintiffs argue that they have been actually injured in the past, and are subject to future proceedings which will use the same unconstitutional procedures. Pl. Br. at 35.

To satisfy the "case or controversy" standing requirement under Article III, a plaintiff must establish that he or she has suffered a cognizable injury that is causally related to the alleged conduct of the defendant and is redressable by judicial action. In the jurisprudence of standing, a "litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991); *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75 (1982); *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 538 (3d Cir. 1994). A plaintiff will fail to meet this requirement if the plaintiff merely raises a "generally available

grievance about government-claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573–74 (1992).

When a plaintiff seeks prospective injunctive relief, his or her standing to seek the injunction depends on whether he or she is likely to suffer future injury from the behavior sought to be enjoined. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *see also Pennsylvania Prison Soc. v. Cortes*, 508 F. 3d 156, 166–67 (3d Cir. 2007). In *Lyons*, for example, the plaintiff sued the City of Los Angeles claiming that police officers had applied a "chokehold" to him at a traffic stop, without justification. *Lyons*, 461 U.S. at 97–98. The plaintiff sought, among other relief, "a preliminary and permanent injunction against the City barring the use of the control holds." *Id.* at 98. The United States Supreme Court held that the plaintiff did not have standing to seek the injunction. *Id.* at 105. Noting its prior holding that "'[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects,'" *id.* at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)), the Supreme Court found that the fact that Lyons had been choked by the police in the past "does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* at 105. The Supreme Court further stated that "[t]he additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy between these parties." *Id.*

at 106. To establish a case or controversy, Lyons needed to allege that he was likely to have another encounter with the police, and also either "(1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner." *Id.*

The initial inquiry in a putative class action suit is whether the lead Plaintiff has standing individually. *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007); see also *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."). Therefore, I must determine whether any of the named Plaintiffs has standing to assert his claims.

Defendants do not dispute that Plaintiffs have standing to assert claims for damages for their past injuries, only that they lack standing for injunctive relief. I disagree, and find that, under the *Lyons* rule, most of the named Plaintiffs have shown facts sufficient to demonstrate a case or controversy with Defendants for injunctive relief. With the exception of Edelglass, whose child is no longer a minor, all of the Plaintiffs have alleged that they currently have minor children. Accordingly, the state courts maintain jurisdiction over Plaintiffs' child custody matters. N.J. Stat. Ann. § 2A:34-23. Plaintiffs, unlike the plaintiff in *Lyons*, can therefore show that they are likely to have another encounter with the Family Part courts. Plaintiffs have alleged that the state courts have a policy of denying parents a plenary hearing when one parent loses custody to the other parent. Am. Compl. at ¶ 102. Plaintiffs further allege that this policy is authorized by the New Jersey Supreme Court and Appellate Division. *Id.* at ¶¶ 100–101. Therefore, Plaintiffs have alleged that they are likely to suffer such an injury again. For the same

reason, their claims are not moot. Under the standing rule of *Lyons*, Plaintiffs, with the exception of Edelglass, have shown that they have a live case or controversy.

Plaintiff Edelglass can make no such showing. His only child has already reached the age of majority, and, as the complaint acknowledges, can now choose to see his father of his own accord. Am Compl. at ¶ 16. Edelglass cannot again lose custody without a plenary hearing, and therefore his claims for injunctive relief must be dismissed.

As to all other named Plaintiffs, however, Defendants' motion to dismiss the case on standing grounds is denied.

**E. Sovereign Immunity**

Defendants assert that they are protected by sovereign immunity, and therefore all claims must be dismissed. First, Defendants assert the State and the state officers who act on its behalf are protected by the Eleventh Amendment. Def. Br. at 30–31. Defendants argue that the Eleventh Amendment also bars recovery under § 1983. Defendants next claim that neither the State, the Jurist Defendants, nor Defendant Smith are "persons" amenable to suit under § 1983. *Id.* at 32. Plaintiffs counter that the Eleventh Amendment is no bar to prospective injunctive relief against either a State or its officials. Pl. Br. at 35–36. Plaintiffs also contend that the Eleventh Amendment is not a bar to actions arising "directly under the equal protection clause of the Fourteenth Amendment,"*id.* at 36, and that the Eleventh Amendment does not bar suits against state officials in their individual capacities. *Id.* at 37.

Plaintiffs incorrectly argue that the Eleventh Amendment does not bar prospective injunctive relief against a State, because while § 1983 permits suits against persons acting under color of state law, the Supreme Court has held that a State is not a "person" within the meaning of the statute. *Will v. Michigan Dep't of State*, 491 U.S. 58, 65 (1989). The Supreme Court

concluded that "Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity." *Id.* at 66. Therefore all claims asserted directly against the State of New Jersey are dismissed.

Suits against state officials are more complex. It is true, as Plaintiffs assert, that state officials sued in their individual capacities are "persons" under § 1983, and thus suits against them are not barred by the Eleventh Amendment. *Hafer v. Melo*, 502 U.S. 21, 31 (1991). However, Plaintiffs have not sued any of the Defendants in their individual capacities. Thus, this argument is unavailing. Furthermore, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71 (internal citations omitted). However, "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* at 71 n.10 (quoting *Kentucky v. Graham*, 473 U.S. at 167 n.14 (1985)). Thus, the only § 1983 suits that may proceed against a state official, sued in his or her official capacity, are suits for injunctive relief rather than monetary damages.

Plaintiffs are suing both for monetary damages and for injunctive relief. To the extent that Plaintiffs have made claims for monetary damages against either the State or state officials acting in their official capacity, these claims are barred by the Eleventh Amendment and must be dismissed. Additionally, Plaintiff Quinlan's claim that the State of New Jersey erroneously entered him into a database showing a restraining order against him, lies solely against the State, and not against any of the individual Defendants. Thus, that portion of Quinlan's claim must be dismissed. However, Plaintiffs' remaining actions against the individual Defendants, sued in their official capacities for injunctive relief, which involve Plaintiffs' custody hearings, and the

24

claims regarding the "gag" order and the weapons order, are not actions against the State, and are therefore not barred by the Eleventh Amendment.

### F. Respondeat Superior

Closely related to the sovereign immunity claim is Defendants' argument that Plaintiffs' claims under § 1983 against the individual Defendants are premised on a theory of *respondeat superior*, and therefore cannot be maintained. Def. Br. at 34–35. The individual Defendants are the Presiding Judges of their respective Counties, and the Clerk of the New Jersey Superior Court; none of the Defendants presided over Plaintiffs' custody hearings, nor did they enter any of the orders which are the source of the Plaintiffs' claims. For that reason, Defendants assert that Plaintiffs have failed to allege that any of the individual Defendants personally engaged in any specific conduct which resulted in the denial of Plaintiffs' rights. *Id.* at 35. Plaintiffs dispute Defendants' contention that their case is based on a *respondeat superior* theory. Pl. Br. at 37. Instead, Plaintiffs argue, that Defendants, in their capacities as Presiding Judges and Clerk of the Superior Court, directly caused their injuries by promulgating and enforcing a policy of not providing plenary hearings for a parent stripped of custody in favor of another parent. *Id.*

Liability for a § 1983 claim cannot be premised solely on a theory of *respondeat superior*; rather "an individual government defendant in a civil rights action must have personal involvement in the alleged wrongdoing." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (internal quotation marks and citation omitted). However, a supervisor, whether an individual or an entity, may be liable for a constitutional violation under § 1983 if the supervisor is "the moving force" behind the violation. *Sample v. Diecks*, 885 F.2d 1099, 1116–17 (3d Cir. 1989) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). Moreover, "a 'person' is not the 'moving force [behind] the constitutional violation' of a subordinate unless that 'person'—

25

whether a natural one or a municipality—has exhibited deliberate indifference to the plight of the person deprived." *Id.* at 1118 (quoting *City of Canton*, 489 U.S. at 389). In addition, "liability may be imposed where the risk of constitutional violations is so great and obvious that deliberate indifference can be inferred from that risk and the [defendant]'s failure to address it." *Id.* at 1117. However, "[a] civil rights plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a relationship between the identified deficiency and the ultimate injury." *Rodriguez v. Town of West New York*, 191 Fed. App'x 166, 168 (3d Cir. 2006) (quoting *Brown v. Muhlenberg Township*, 269 F.3d 205, 216 (3d Cir.2001)).

Alternately, "when a policymaking official establishes a constitutionally inadequate state procedure for depriving people of a protected interest and someone is thereafter deprived of such an interest, the official has 'subjected' that person to a due process violation." *Sample*, 885 F.2d at 1114 (3d Cir. 1989). When an official authorizes an unconstitutional procedure, there is no state-of-mind requirement; all that is required is that "the official authorizes a system with the intention that it will operate to deprive persons of life, liberty, or property, whether or not he intends the deprivation to be without due process of law." *Id.* However, before the official can be held liable, it must be shown that "he is responsible for establishing or maintaining a state process that does not comport with due process." *Id.* at 1116.

The argument that a § 1983 suit cannot be maintained on a theory of *respondeat superior* is analyzed under Rule 12(b)(6). Therefore, I must examine the allegations of the Complaint in the light most favorable to Plaintiffs. I note that Defendants have not moved under Rule 12(b)(6) claiming that these claims do not state violations as a matter of law; the question is whether the Plaintiffs have stated a claim against these individual Defendants, in their official capacity, or if

the claim is dependent on the unavailable theory of *respondeat superior*. Plaintiffs allege in Count 1 that Defendants "have established policies, procedures, and precedents denying parents a full and prompt hearing when stripping one parent of physical and legal custody and giving full physical and legal custody to another parent." Am. Compl. at ¶ 107. Counts 2 and 3 "re-allege previous paragraphs as fully stated," and therefore include this allegation. Under either the supervisory responsibility rubric or under the analysis of whether the policymaking official established an unconstitutional process, I find that this allegation is insufficient to make out a claim under § 1983 for a violation of due process with respect to custody hearings, because Plaintiffs have failed to specifically allege how the individual Defendants are responsible for this policy. The fact that the individual Defendants are Presiding Judges, or the Clerk of the Superior Court, is not enough, in and of itself, to make out a claim against them. Plaintiffs must either "identify specific acts or omissions of the supervisor that evidence deliberate indifference" *Rodriguez*, 191 Fed. App'x at 168, or allege facts that demonstrate that these individual Defendants are "responsible for establishing or maintaining a state process that does not comport with due process." *Sample*, 885 F.2d at 1116. This Complaint can be maintained only if Plaintiffs can point to specific actions by these individual Defendants, acting in their official capacities, which established the policies that led to their denial of due process. Broad allegations that parents are often denied their rights in New Jersey, or citations to New Jersey Supreme Court cases do not suffice to show that these individual Defendants, in their official capacities, caused Plaintiffs' due process violations. Without such allegations, Plaintiffs' Amended Complaint can only be read to assert that the individual Defendants were responsible for Plaintiffs' violations because they held supervisory positions over the judges who presided in the Plaintiffs' cases—in other words, that they are liable under *respondeat superior*.

Moreover, Plaintiffs' allegation that Defendants "have established policies, procedures, and precedents" is limited only to their claims regarding custody hearings. With respect to Plaintiffs Malhan and Quinlan's claims that their First and Second Amendment rights were violated, Plaintiffs have not alleged that any of the individual Defendants are responsible for the policy underlying the alleged violation. Plaintiffs merely assert that the application of a "best interest standard" to strip parents of "other fundamental rights, such as free speech" "is widespread enough to constitute a policy." Again, unless the individual Defendants can be shown to be the "moving force" behind the alleged policy, they cannot be held liable under § 1983. No such assertions are made in the Amended Complaint

Thus, Plaintiffs' claims are based on a theory of *respondeat superior*, and Defendants' motion to dismiss for failure to state a claim on that ground is granted.

### G. Statute of Limitations

Although all claims have been dismissed because they sound in *respondeat superior*, dismissal on those grounds is without prejudice. Therefore, I will examine the question of the statute of limitations, in order to determine whether any of Plaintiffs' claims should be dismissed with prejudice. Defendants assert that the claims of five of the six Plaintiffs are barred by the statute of limitations. Def. Br. at 26. Defendants contend that "each cause of action arose on the date when Plaintiffs allegedly lost custody of their children," and that each of those dates occurred prior to the two-year statute of limitations date. *Id.* at 26–27. Plaintiffs assert, however that the statute of limitations does not bar prospective relief. Pl. Br. at 33. Plaintiffs further argue that the statute of limitations which should be applied is the six-year "catch-all" provision, N.J. Stat. Ann. § 2A:14-1. *Id.* at 34. Finally, Defendants maintain that the deprivation of their parental rights was a continuing violation, and thus continued to accrue following the court orders. *Id.*

The statute of limitations in an affirmative defense, under Federal Rule 8(c). "Under the law of this and other circuits, however, the limitations defense may be raised on a motion under Rule 12(b)(6), but only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978) (quoting *Hanna v. United States Veterans' Administration Hospital*, 514 F.2d 1092, 1094 (3d Cir. 1975)). Although § 1983 provides a federal cause of action, the statute of limitations to be applied is the one "which the State provides for personal-injury torts." *Wallace v. Kato*, 549 U.S. 384, 387 (2007); *see also Cito v. Bridgewater Twp. Police Dep't*, 892 F.2d 23, 25 (stating that for § 1983 claim arising in New Jersey, two-year personal injury statute applies, not six-year residual statute). In New Jersey, the personal-injury tort statute of limitations is two years. N.J. Stat. Ann. § 2A:14-2.

"Traditionally and for good reasons, statutes of limitation are not controlling measures of equitable relief." *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946). However, "when the jurisdiction of the federal court is concurrent with that of law, or the suit is brought in aid of a legal right, equity will withhold its remedy if the legal right is barred by the local statute of limitations." *Russell v. Todd*, 309 U.S. 280, 289 (1940). Although § 1983 provides for both monetary damages and injunctive relief, very few courts have examined whether claims for injunctive relief are also barred by state statutes of limitations. The most recent federal appellate case comes out of the Fifth Circuit, where death row inmates filed a § 1983 claim challenging Mississippi's lethal injection protocol. *Walker v. Epps*, 550 F.3d 407, 408 (5th Cir. 2008). The State of Mississippi asserted a statute of limitations defense; the plaintiffs contended, *inter alia*, that because they sought only equitable relief, the statute of limitations did not apply. *Id.* at 410.

The Fifth Circuit, citing *Wilson v. Garcia*, 471 U.S. 261 (1985), applied the statute of limitations bar:

> The Supreme Court was fully aware when it decided Wilson that actions seeking equitable relief only could be brought under § 1983. If the Supreme Court had intended to exclude such actions from its rule, it would have explicitly stated so in *Wilson*. It is plain, however, that the Court, in directing courts in each state to select "the one most appropriate statute of limitations for all § 1983 claims," made no exception in *Wilson* for § 1983 actions that seek only equitable relief. Indeed, the Court was seeking to avoid the precise dispute we face here: The Court observed that if the statute depended on the particular facts or legal theory, "counsel could almost always argue, with considerable force, that two or more periods of limitations should apply to each § 1983 claim." In the same vein, *Wilson* stressed that resolving the question of whether an action had been timely filed should be "an uncomplicated task for judges, lawyers, and litigants, rather than a source of uncertainty, and unproductive and ever-increasing litigation." *Wilson*'s strongly expressed interests in judicial economy suggest to us a finding of no exception for actions seeking equitable relief.

> [*Id.* at 412 (citations omitted)].

Other Circuit Courts of Appeal have come to the same conclusion, although they made their determinations before the Supreme Court's ruling in *Wilson*. These decisions rely on the fact that a statute of limitations will govern an equitable claim if a legal claim for damages could also have been brought. *See Swan v. Bd. of Higher Ed.*, 319 F.2d 56, 60 n.5 (2d Cir. 1963) (concluding in § 1983 case asking only for declaratory injunctive relief, "that since plaintiff could also have sought Civil Rights Act relief by way of damages, he is not here asserting a federal right for which the sole remedy is in equity, and hence the situation is one of 'concurrent' legal and equitable jurisdiction, in which case the statute of limitations does apply." (internal quotation marks and citation omitted)); *Williams v. Walsh*, 558 F.2d 667, 671 (2d Cir. 1977) (holding in § 1983 case that statute of limitations applied to both claim for damages and claim for injunctive relief); *Madison v. Wo*od, 410 F.2d 564, 567 (6th Cir. 1969) (holding in § 1983

case that plaintiff's "claim is outlawed [by the statute of limitations] even though he amended his complaint to seek purely equitable relief because 'equity will withhold its relief . . . where the applicable statute of limitations . . . bar(s) the concurrent legal remedy.'" (citation omitted)). Despite the paucity of case law on the issue, what law there is indicates that the two-year statute of limitations applies to Plaintiffs' claims, including their claims for prospective injunctive relief.

Plaintiffs, however, assert that the court orders to which they were subjected resulted in ongoing injuries, and so the orders constituted a continuing violation of their rights. "The continuing violations doctrine is an equitable exception to the timely filing requirement," which states that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (internal quotation marks and citation omitted). However, "'[a] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation.'" *Id.* at 293 (quoting *Ocean Acres Ltd. v. Dare Cnty. Bd. of Health*, 707 F.2d 103, 106 (4th Cir. 1983)).

In *Cowell*, the plaintiffs asserted that the imposition of municipal liens on their properties violated their due process rights under the Fourteenth Amendment. *Id.* at 291. The Third Circuit found that their claims were barred by the statute of limitations, holding that "[t]he mere existence of the liens does not amount to a continuing violation. Neither was the Township's refusal to remove the lien an affirmative act of a continuing violation." *Id.* at 293. Similarly, the Third Circuit has held that the enforcement of a custody order did not constitute a continuing violation. *Rose v. Cnty. of York*, 262 Fed. Appx. 485, 487 (3d Cir. 2008). In that case, the appellant asserted violations of his civil rights stemming from a custody dispute, including a claim that the order denying him custody "violated Appellant's procedural due process; and, thus,

31

violated Appellant's right to raise his child." *Id.* at 486. The appellant argued there was a continuing violation because "[t]he damages resulting from [the custody] order are still being enforced on the [Appellant]." *Id.* at 487. The Third Circuit concluded that "asserted continuing violations arise from the ill effects of the original alleged violation," and found the enforcement of the order was not a continuing violation *Id.*

As in *Rose* or *Cowell*, Plaintiffs' claims do not demonstrate continuing violations which would provide for an equitable exception to the statute of limitations. Each Plaintiff complains that on particular hearing dates, he was denied the right to a plenary hearing. Each Plaintiff also complains that custody orders which were filed denied that Plaintiff the right to parent his child or children. The allegedly unlawful acts at issue, therefore, are either the alleged absence of plenary hearings or the issuance of the orders that followed. The fact that Plaintiffs were unable to parent their children following the hearings or the orders "arise from the ill effects of the original alleged violation," but this continuing effect does not amount to a "continual unlawful act." *See Cowell*, 263 F.3d at 293. Thus, the two-year statute of limitations applies to Plaintiffs' claims

Plaintiffs' original complaint was filed on February 5, 2014; Plaintiffs claims must therefore have accrued on or after February 5, 2012. I will therefore examine each Plaintiff's claims to determine if he has asserted any act within that time period. It is not always clear whether the dates in the Amended Complaint represent motion dates, hearing dates, or order dates; for the purposes of determining whether the action falls within the statute of limitations, I will assume that any ambiguous date is the date of the hearing or order.

Plaintiff Edelglass[4] lost custody of his child in December of 1997; his requests for additional hearings in April 1998 and March 2006 were denied. Am. Compl. at ¶¶ 12, 15, 17. None of these dates fall within the statute of limitations, and therefore Plaintiff Edelglass's claims are dismissed.

A temporary restraining order was issued against Plaintiff Graf on January 9, 2012; the order was amended on February 10, 2012, and again on March 22; it was dismissed with prejudice in August of 2012. *Id.* at ¶¶ 20, 28, 33. Graf asserts that he "pursued costly motions and certifications" between the time the TRO was filed and its amendments. *Id.* at ¶¶ 28–29. Graf's claims rest on his assertion that the TRO was filed "on the basis of McComb's unchallenged (and in some cases prompted) allegations . . . on January 9th." *Id.* at ¶ 36. Graf does not assert that the motions which occurred following the TRO contained due process violations. Accordingly, Graf's claim is barred by the two-year statute of limitations.

Defendants concede that Plaintiff Joshi's claims are not time-barred. Def. Br. at 26 n.2.

On May 7, 2008, Plaintiff Litton asked the Ocean County Court to enforce his custody agreement; the Court instead suspended his visitation on May 8, 2008. *Id.* at ¶¶ 49, 52. The Order remained in effect until March 24, 2010. *Id.* at ¶¶ 54–55. Plaintiff Litton's claims are barred by the statute of limitations.

Plaintiff Malhan was stripped of custody on Feb. 24, 2011. *Id.* at ¶ 65. On April 1, 2011, there was an additional hearing, but not a plenary one, and Malhan was denied legal and physical custody. *Id.* at ¶ 68. In June 2012, the children's mother agreed to joint custody. Plaintiff Malhan's claims regarding his custody hearings are barred by the statute of limitations.

---

[4] Plaintiff Edelglass' claims have already been dismissed for lack of standing, *see supra*. However, his claims are also subject to the statute of limitations bar, and are mentioned for the sake of completeness.

However, Plaintiff Malhan further asserts in both Counts 1 and 2 that his rights were violated by the "gag order" issued on April 4, 2014. This order is within the statute of limitations, and this claim is therefore not time-barred.

Plaintiff Quinlan was stripped of legal custody, without a full hearing, on December 16, 2010. *Id.* at ¶ 81. Any claims regarding this hearing are time-barred. Quinlan also asserts that an "administrative error" led to an incorrect restraining order in a national database.[5] *Id.* at ¶ 86. However, Quinlan does not indicate the date this order was entered, or the dates of his demands that the error be fixed. Similarly, Quinlan does not indicate the date of the order that prevents him from possessing any weapons, which he claims was also issued in violation of due process. *Id.* at ¶ 91. As the Complaint on its face does not "show[] that the cause of action has not been brought within the statute of limitations," *Bethel*, 570 F.2d at 1174, these claims are not subject to dismissal on that basis.

Thus, Defendants' motion to dismiss on the basis of the statute of limitations is granted in part, as described above.

**H. Judicial and Qualified Immunity**

In addition to the defenses raised above, Defendants assert that the Jurist Defendants are entitled to judicial immunity, and that all individual Defendants are entitled to qualified immunity. Def. Br. at 36, 40. However, at this point, the majority of the Plaintiffs' claims have been dismissed with prejudice; the few remaining claims—Plaintiff Joshi's claim regarding his custody hearings, Plaintiff Malhan's claims regarding the "gag order," and Plaintiff Quinlan's claims regarding the weapons order—have been dismissed for failure to plead how any of the

---

[1] In addition to the dismissal based on *respondeat superior*, this claim has been dismissed as barred by the Eleventh Amendment. *See supra.* I address the statute of limitations issue again for the sake of completeness.

actions of the individual Defendants caused these Plaintiffs harm. Finally, because all claims have been dismissed, an analysis of judicial immunity and qualified immunity is not necessary.

## IV. CONCLUSION

For the reasons expressed above, Defendants' motion to dismiss is granted. First, all claims against the State of New Jersey and all damages claims against the individual Defendants are dismissed as barred by the Eleventh Amendment. Additionally, all of the Plaintiffs' claims against the individual Defendants are dismissed, without prejudice, because they are based on a theory of *respondeat superior*, and therefore fail to state a claim under § 1983. Certain of the individual claims are also dismissed with prejudice: (1) all of Plaintiff Edelglass's claims are dismissed for lack of standing and as barred by the statute of limitations; (2) all of Plaintiff Graf's claims are dismissed as barred by the statute of limitations; (3) all of Plaintiff Litton's claims are dismissed as barred by the statute of limitations; (4) Plaintiff Malhan's claims regarding his custody hearings are dismissed as barred by the statute of limitations; and (5) Plaintiff Quinlan's claims regarding on his custody hearings are dismissed as barred by the statute of limitations.

Plaintiff Joshi's claim that he was denied full and equal custody of his children for over a year without due process is dismissed without prejudice. Similarly, Plaintiff Quinlan's claims based on the weapons order and Plaintiff Malhan's claims regarding the "gag order" are also dismissed without prejudice.[6]

An appropriate Order shall follow.

---

[6] The Court makes no comment on the viability of the foregoing claims surviving a Rule 12(b)(6) motion that addresses the substance of the claims or who may be named as defendants to such claims.

Date:   January 16, 2015                    _____/s/ Freda L. Wolfson_____

                                                 Hon. Freda L. Wolfson, U.S.D.J.