**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
:
ANTHONY ALLEN for himself and as        :
parent of A.A., TODD BENNETT, for       :
himself and as parent of E.B., SCOTT    :
EDELGLASS, SHARIR FELDMAN, for          :
himself and as Parent of A.F. and J.F,  :
WERNER GRAF, for himself and as parent  :
of A.G. and A.G., KARL HAGBERG, for     :
himself and as parent of E.H, A.H. and  :
C.H., CLIFTON HILL, for himself and as  :
Parent of A.H, SAMIR JOSHI, for himself :
and as parent of J.J., J.J and J.J., YEHUDA :
B. LITTON, SURENDER MALHAN, for         :
himself and as parent of E.M and V.M.,  :
CARLY OLIVIER for himself and as        :
parent of M.O, ANTONIO QUINLAN for      :
himself and as parent of K.Q., ZIA      :
SHAIKH for himself and as parent of M.S., :
S.S., and H.S for themselves and on     :
behalf of all others similarly situated, :
                                        :
                    Plaintiffs,         :
                                        :
        v.                              :
                                        :
LAWRENCE DE BELLO, TIMOTHY              :
CHELL, KATHLEEN DE LANEY,               :
JAMES DEMARZO, MADELIN                  :
EINBINDER, MARLENE LYNCH FORD, :
CHRISTOPHER GARENGER,                   :
LAWRENCE JONES, SEVERIANO               :
LISBOA, ANTHONY MASSI, JOHN             :
TOMASELLO, SHERRI SCHWEITZER,           :
NANCY SIVILLI, and MAUREEN              :
SOGLUIZZO,                              :
                                        :
                    Defendants.         :
_____ :
                                        :
ANTHONY ALLEN for himself and as        :
parent of A.A., TODD BENNETT, for       :

Civil Action No. 14-0760 (FLW)(DEA)

## <u>OPINION</u>

Civil Action No. 15-3519 (FLW)(LHG)

1

himself and as parent of E.B.,                          :
SHARIR FELDMAN, for himself and          :
As Parent of A.F. and J.F, KARL              :
HAGBERG, for himself and as parent of    :
E.H, A.H. and C.H., CLIFTON HILL, for    :
himself and as parent of A.H, CARLY       :
OLIVIER for himself and as parent of M.O, :
ZIA SHAIKH for himself and as parent of   :
M.S., S.S., and H.S for themselves and on  :
behalf of all others similarly situated,          :
                                                                       :
                           Plaintiffs,          :
                                                                       :
     v.                                                       :
                                                                       :
TIMOTHY CHELL, KATHLEEN              :
DELANEY, JAMES DEMARZO,                 :
MADELIN EINBINDER, LAWRENCE      :
JONES, SEVERIANO LISBOA,                 :
JOHN TOMASELLO, SHERRI                   :
SCHWEITZER, NANCY SIVILLI,             :
and MAUREEN SOGLUIZZO,                  :
                                                                       :
                       Defendants.       :
_____ :

**WOLFSON, United States District Judge:**

     These matters come before the Court on three motions in two separately filed actions, in which Plaintiffs have sued the individual state court judges who have (and may continue) to preside over Plaintiffs' child custody disputes.  First, in No. 14-0760, Plaintiffs Anthony Allen, Todd Bennett, Sharir Feldman, Werner Graf, Karl Hagberg, Clifton Hill, Samir Joshi, Surender Malhan, Carly Olivier, Antonio Quinlan, and Zia Shaikh (collectively "Plaintiffs") have filed a motion for a preliminary injunction with respect only to Plaintiffs Hagberg and Shaikh's child custody determinations, but have not moved for similar preliminary relief for the other Plaintiffs, or sought such relief on behalf of Hagberg and Shaikh in No. 15-3519, a substantially identical matter to which they are also parties.  Second, Defendant Judges Lawrence De Bello, Timothy Chell, Kathleen Delaney, James DeMarzo, Madelin Einbinder, Marlene Lynch Ford, Christopher

2

Garenger, Lawrence Jones, Severiano Lisboa, Anthony Massi, John Tomasello, Sherri Schweitzer, Nancy Sivilli, and Maureen Sogluizzo (collectively "Defendant Judges") have cross-moved for dismissal of the Amended Complaint filed in No. 14-0760, pursuant to Federal Rule of Civil Procedure 12(b)(6). Third, Defendant Judges Chell, Delaney, DeMarzo, Einbinder, Jones, Lisboa, Massi, Tomasello, Schweitzer, Sivilli, and Sogluizzo have moved for dismissal of the Complaint filed in No. 15-3519, pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] For the following reasons, Defendant Judges' motion to dismiss in No. 14-0760 is granted and their motion to dismiss in No. 15-3519 is granted in part and denied in part. Plaintiffs' motion for a preliminary injunction in No. 14-0760 is denied as moot.

Plaintiffs seek to have this Court dramatically change the legal landscape of New Jersey and the laws governing child custody proceedings between parents. In suing the Defendant Judges who have presided over their child custody cases, Plaintiffs interpret the United States Constitution as requiring that when parents divorce or separate, each parent has a fundamental right to automatically receive 50-50 custody of his or her children, and that courts are limited to ordering a different custody arrangement only upon a finding, by clear and convincing evidence, in a plenary hearing (and with a right to counsel for both parents), that one of the parents abuses or neglects the child or is otherwise an unfit parent. Without commenting on the merits of Plaintiffs' suggested interpretation of the Constitution, this Court finds that Defendant Judges are not the proper defendants for Plaintiffs' request for declaratory relief because they were all acting as neutral arbiters in the underlying custody disputes, and Plaintiffs' request for injunctive relief must fail because Plaintiffs have an adequate remedy at law.

---

[1] Judges De Bello, Ford, Garenger, and Massi are not defendants in No. 15-3519.

3

Accordingly, Plaintiffs' claims concerning their custody hearings are dismissed with prejudice.  For the same reasons, Plaintiff Malhan's claim concerning his gag order and Plaintiff Quinlan's claim concerning his weapons order are dismissed with prejudice.  The only claim that remains is Plaintiff Hagberg's challenge in No. 15-3519, as an employee of a media outlet, to the gag order entered by Judge Sivilli in Malhan's underlying custody matter, which the parties have not adequately addressed on the motions before the Court.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs in these matters have engaged in a number of questionable litigation tactics which have resulted in a very confused record.  Accordingly, this Court must clarify several issues before it begin its recitation of the facts still at issue in the pending matters.

On February 5, 2014, Plaintiffs Edelglass, Joshi, Litton, Malhan, and Quinlan originally filed suit against the State of New Jersey and four individual defendants:  Michelle M. Smith, Esq., the clerk of the Superior Court of New Jersey, and Judges John  L. Call, Jr., Maureen Sogluizzo, and Patricia B. Roe, who were all sued "in their capacity as administrators tasked with enforcing policies which deny plaintiffs['] constitutional rights under color of law[.]"  Compl. ¶ 9.  Plaintiffs filed an Amended Complaint on April 14, 2014, which added Graf as a plaintiff and Judges Thornton and Fitzpatrick as defendants and asserted plaintiffs' claims both individually and on behalf of a putative class

On June 14, 2014, Judges Call, Sogluizzo, Roe, Thornton, and Fitzpatrick, along with the State of New Jersey and Smith, filed a motion to dismiss the Amended Complaint.  On January 16, 2015, this Court issued a decision dismissing all of the claims in No. 14-0760.  Specifically, the Court determined that (1) Eleventh Amendment immunity barred the plaintiffs' claims against

the State of New Jersey[2] and against individual defendants, sued in their official capacities, to the extent plaintiffs sought monetary damages; (2) that the all claims asserted by Plaintiffs Edelglass, Graf, and Litton, were barred by the statute of limitations, along with Plaintiffs Malhan and Quinlan's claims concerning their custody hearings (but not their respective claims regarding the gag and weapons orders); (3) and that all the plaintiffs' claims against individual defendants, including those of Plaintiffs Joshi, Malhan, and Quinlan, were dismissed without prejudice because they were based on the theory of *respondeat superior* and, therefore, failed to state a claim under 42 U.S.C. § 1983.

Following that dismissal, Plaintiffs filed a Second Amended Complaint which drastically changed the make-up of the parties.  The original six plaintiffs (Edelglass, Graf, Joshi, Litton, Malhan, and Quinlan), were expanded to thirteen (Allen, Bennett, Edelglass, Feldman, Graf, Hagberg, Hill, Joshi, Litton, Malhan, Olivier, Quinlan, and Shaikh).

Moreover, while the Court dismissed the claims asserted by Edelglass, Graf, and Litton with prejudice, they nevertheless reasserted their claims in the Second Amended Complaint, and only Plaintiff Graf has plead additional new allegations that occurred within the applicable limitations period.  *See* Sec. Am. Compl. ¶¶ 91-92, 94, 102-03.  Thus, although Plaintiffs have continued to include allegations concerning Edelglass and Litton in the Second Amended Complaint, *id.* at ¶¶ 60-67, 80-103, 166-177, and, indeed, appear to have even expanded these allegations in ways that do nothing to cure the statute of limitations bar, *see id.* at ¶¶ 62-64, 66-67,

---

[2] In addition, Plaintiff Quinlan's claim for injunctive relief against the State of New Jersey, seeking the correction of his being listed in a database showing a restraining order was entered against him, was also dismissed as barred by the Eleventh Amendment.

80, 87, 168, 176-77, the claims of Edelgass and Litton in No. 14-0760,[3] are dismissed with prejudice.

Similarly, this Court dismissed with prejudice Plaintiff Malhan and Quinlan's claims concerning their custody hearings based on their failure to file suit within the relevant two-year statute of limitations, but not their claims concerning Malhan's gag order and Quinlan's weapons order. The Second Amended Complaint includes new allegations concerning Malhan and Quinlan's custody hearings, which also do nothing to cure the statute of limitations bar. *See* Sec. Am. Compl. ¶¶ 183-86, 189-92, 228. These claims are dismissed with prejudice.

Moreover, on February 23, 2016, this Court entered an Order – at Plaintiffs' request – dismissing with prejudice any and all claims and allegations brought on behalf of putative class members.[4]

The Second Amended Complaint also completely revamped the roster of defendants in No. 14-0760. The Amended Complaint originally named the State of New Jersey and six individual defendants: Smith and Judges John. L. Call, Jr.; Maureen Sogluizzo; Catherine Fitzpatrick; Lisa Thornton; and Patricia B. Roe, who were all sued "in their capacity as administrators tasked with enforcing policies which deny plaintiffs['] constitutional rights under color of law[.]" Am. Compl. ¶ 9. Following this Court's decision in January, the Second Amended Complaint added an entirely new list of fourteen defendants (with the exception of Judge Sogluizzo, who is now only sued

---

[3] Edelgass, Graf, and Litton are not named as parties in no. 15-3519, but their allegations are repeated in the Complaint in that matter under the heading "Additional Histories Showing Systematic Deprivation of Parental Rights."

[4] The Court notes that although some of Plaintiffs' claims share some of (but not all) the same common questions of law, it is questionable whether it is appropriate for all Plaintiffs to have joined in one, unwieldly action, because as demonstrated by the substantial factual recitation which follows, each Plaintiff's individual claims stand on their own specific facts.

because she allegedly presided over one custody matter):  Judges Lawrence De Bello, Timothy Chell, Kathleen Delaney, James DeMarzo, Madelin Einbinder, Marlene Lynch Ford, Christopher Garenger, Lawrence Jones, Severiano Lisboa, Anthony Massi, John Tomasello, Sherri Schweitzer, Nancy Sivilli, and Maureen Sogluizzo, who are now sued "in their official and individual capacities" because, allegedly, "by their actions and policies they denied plaintiffs constitutional rights under color of law."  Sec. Am. Compl. ¶ 16.  However, the only allegations asserted against Judge De Bello in the Second Amended Complaint concern the custody order he entered with respect to Graf's children on January 9, 2012.  *Id.* at ¶¶ 86-87, 97, 100, 102-03.  This claim was previously dismissed, with prejudice, as barred by the statute of limitations and should not have been re-plead here.  The claims against Judge De Bello are dismissed with prejudice.

Following this Court's decision in January, but before filing the Second Amended Complaint on August 7, 2015, Plaintiffs Allen, Bennett, Feldman, Hagberg, Hill, Olivier, and Shaikh filed a separate action, No. 15-3519, on May 22, 2015.  On December 10, 2015, this Court ordered both matters consolidated for motion purposes.  A side-by-side review of the relevant pleadings in these two matters reveals that, with the exception of three paragraphs concerning Judge Sivilli's "gag order" issued against Plaintiff Malhan, No. 15-3519 Compl. ¶¶ 12, 16, 83, which Plaintiffs inexplicably omitted from the Second Amended Complaint in No. 14-0760, the only differences between the two relevant pleadings are (1) the addition of new parties in the latest complaint filed in No. 14-0760; (2) the re-packaging of allegations concerning Plaintiff Malhan's gag order with respect to Plaintiff Hagberg, *id.* at ¶¶ 79-83; and (3) inconsequential typographical errors and stylistic changes, *see, e.g.*, *id.* at ¶¶ 11, 79, 108.  Accordingly, in the interest of

efficiency, this Court will refer primarily to the Second Amended Complaint to set forth the facts underlying this decision.[5]

In summary, these matters now only concern (1) the custody hearings of nine individual plaintiffs (Allen, Bennett, Feldman, Graf, Hagberg, Hill, Joshi, Olivier, and Shaikh); (2) Malhan's challenge to his gag order; (3) Quinlan's challenge to his weapons order; and (4) Hagberg's challenge to Malhan's gag order, and (5) thirteen judicial defendants (Judges Chell, Delaney, DeMarzo, Einbinder, Ford, Garenger, Jones, Lisboa, Massi, Tomasello, Schweitzer, Sivilli, and Sogluizzo). Having set forth the procedural status of the matters at hand, the Court turns to the facts underlying each individual plaintiff's claims.

### A.      Custody Claims

#### i.      Anthony Allen

Anthony Allen is the father of a minor, A.A., who was born in 1998. Sec. Am. Compl. ¶¶ 3, 20. On September 26, 2003, Allen alleges that he was stripped of custody in a "summary, *ex parte* proceeding" by Judge Raymond Hayser, who issued an order granting custody of A.A. to his mother, Terri Hand. *Id.* at ¶¶ 21-22. Allen alleges that "[o]ver the next decade" he has repeatedly and unsuccessfully sought custody and/or parenting time with A.A. *Id.* at ¶¶ 23-24. Allen alleges that in March of 2009, he sought "joint residential custody" of A.A., and that a different judge, Judge Blackburn, issued an order on March 17, 2009, which limited Allen's parenting time to

---

[5] The Court notes that while these motions were pending, Plaintiffs Hagberg and Shaikh filed yet another complaint, this time against only Judge Ford, under docket no. 16-1189. While the claims in No. 16-1189 may ultimately be decided in the same manner as Plaintiffs' claims today, that matter has not been consolidated with the cases currently before me on motion, and Hagberg and Shaikh have not yet responded to the motion to dismiss filed in that matter; therefore, it would be inappropriate for this Court to rule on the claims at issue in No. 16-1189 at this time. However, these Plaintiffs would be well-advised to tailor their opposition to the Court's rulings on these motions.

"supervised visitation." *Id.* at ¶¶ 24-25. However, Allen alleges that although this order may have been intended to help Allen, it actually represents a "significant restriction on Allen's parental rights as his visitation went from unsupervised to supervised," and that Judge Blackburn did not hold Hand "accountable for her failure to cooperate with earlier court orders." *Id.* at ¶¶ 26-27.

Allen alleges that on December 16, 2010, Judge Massi entered an Order that Allen would have parenting time limited to every other weekend, from Friday after school to Sunday afternoon. *Id.* at ¶ 29. On June 16, 2014, Judge Tomasello ordered that Hand should arrange for counseling "to establish reunification between the Defendant [Allen] and the parties['] daughter." *Id.* at ¶ 30. On January 21, 2015, Judge Tomasello issued a written Order appointing a third party, identified as "Mrs. Kearney," to supervise parenting time and ordered "Mrs. Kearney to pick the dates for parenting time to take place." *Id.* at ¶ 31.

On February 5, 2015, after Hand allegedly failed to bring A.A. to a scheduled visit on February 4th, Allen filed an Order to Show Cause in state court demanding "50% custody + 50% parenting time to start immediately," which was heard by Judge Call, who scheduled a return date for Tuesday February 10, 2015. *Id.* at ¶ 34. On the return date for the motion, Allen alleges that no plenary hearing occurred, but Hand appeared *pro se* and stated that she had been unable to allow parenting time on February 4th due to an unspecified "private" medical problem and that, on another occasion, she had needed to cancel a parenting time session due to weather. *Id.* at ¶ 35. Allen alleges that although Judge Call was critical of Hand's "constant excuses," Judge Call entered an order, despite Allen's objection that he was entitled to 50% custody, that further "reduced Allen's parenting time" without "making any finding that Allen was unable or unfit to parent A.A." *Id.* at ¶¶ 36-40. On March 24, 2015, Allen again appeared in court, this time before Judge Tomasello, to demand 50/50 parenting time. *Id.* at ¶ 41. However, on that date, Allen

alleges that Judge Tomasello signed an Order which further reduced Allan's parenting time with his daughter. *Id.* at ¶ 42.

Allen alleges that he has never received a plenary hearing, even though "there does not appear to be any issue as to whether Allan is a fit parent." *Id.* at ¶ 42. Allen does not specifically challenge the Orders of Judge Hayser, Blackburn, Call, or Massi (despite being a named defendant elsewhere in this matter). Instead, Allen alleges:

> The 2014 and 2015 Orders of Judge Tomasello substantially restricted the legal rights of Allen to the care, custody and control of his children based on no particular findings of fact, but based on a vague concern that A.A. and Allen must be reunified "slowly." These Orders of Judge Tomasello deprived Allen of the care, custody and control of his children with out due process. For years, Allen has sought 50% custody of his daughter, but for years, Judge Tomasello and other family court judges have severely restricted his legal rights without justification and without any apparent standard being applied. These severe restrictions on Allen's custody rights has damaged, and continues to damage the father-daughter relationship between Allen and A.A.

*Id.* at ¶¶ 43-45.

### ii.    Todd Bennett

Todd Bennett is the father of the minor E.B., who was born in 2009. *Id.* at ¶¶ 4, 46. On October 2, 2013, E.B.'s mother, Valerie Galdieri, filed a non-dissolution complaint in the Superior Court, Family Part, Morris County seeking joint legal custody of, and parenting time with, E.B. *Id.* at ¶¶ 46, 48. On May 8, 2014, an unidentified judge entered an order that provided that Bennett and Galdieri would share joint physical custody. *Id.* at ¶ 50.

On August 25, 2014, Galdieri filed an application for an Order to Show Cause demanding that Bennett's parenting time with E.B. be suspended indefinitely, based on her assertion that Bennett had kept the child longer than their unofficial agreement had allowed. *Id.* at ¶¶ 52-53. Bennett alleges that on August 27, 2014, Judge DeMarzo "had the parties and their counsel appear for oral argument. No cross examination of Ms. Galdieri was allowed and no plenary hearing was

conducted." *Id.* at ¶ 54.  On that same date, Judge DeMarzo signed an order "which ordered Bennett to immediately relinquish physical custody of E.B. to Galdieri, and also limited Bennett's parenting time to every other weekend, plus six hours during the week," without making any "findings of fact or conclusions of law" or conducting a hearing.  *Id.* at ¶¶ 55-56.  Specifically, Bennett alleges that Judge DeMarzo "did not find that Bennett was an unfit parent, nor did Judge DeMarzo find any abuse or neglect—which a full investigation [by the New Jersey Division of Child Protection and Permanency] three months earlier had not found either."  *Id.* at ¶¶ 57, 49. Further, Bennett alleges that "Judge DeMarzo did not appear to apply any legal standard at all," *id.* at 58, but rather "arbitrarily, capriciously and without due process, substantially obstructed Bennett's right to the care, custody and control of E.B, causing severe anguish and suffering on the part of father and child."  *Id.* at ¶ 59.

### iii.    Sharir Feldman

Sharir Feldman is the father of minor children A.F. (born 1999) and J.F (born 2002).  *Id.* at ¶¶ 5, 68.  Feldman alleges that "[a]s . . . early [as] October 2013, Feldman had joint legal custody and residential custody of his son J.F., while . . . Feldman's ex-wife, Cristina Langley[,] had residential custody of the daughter A.F."  *Id.* at ¶ 69.

On October 24, 2013, Langley filed an Order to Show Cause in the Hudson County Family Court, demanding physical custody of J.F. as well as demanding that Feldman begin paying Langley child support, which Judge Sogluizzo granted; all of Feldman's parenting time with J.F. was immediately suspended until further notice based on "allegations still being investigated."  *Id.* at ¶¶ 70-71.  Feldman alleges that the October 24 Order not only suspended all parenting time, but also denied telephonic contact between Feldman and J.F., and only allowed text messaging.  *Id.* at ¶ 72.

Feldman alleges that no plenary hearing was held, and "Feldman was not permitted to present any evidence and was not represented by counsel." *Id.* at ¶ 71.  Judge Sogluizzo set a date of December 12, 2013 for "further proceedings," *id.* at 72, but that, "December 12 came and went but there was no change in custody. *Id.* at ¶ 73.  On March 10, 2014 Judge Sogluizzo conducted a "hearing review," and, in an Order dated March 10, 2014, Judge Sogluizzo permitted some parenting time to Feldman, but still continued to severely limit Feldman's parental rights "without any apparent reason." *Id.* at ¶¶ 75-76.

### iv.   Werner Graf

Werner Graf is the father of minor children A.G. (born in 2004) and A.G. (born in 2008). *Id.* at ¶¶ 6, 80.  On January 9, 2012, Graf's wife, Lisa McComb, filed for an *ex parte* domestic violence temporary restraining order ("TRO").  *Id.* at ¶¶ 80-81.  On that same date, Judge De Bello signed the TRO, "without making any findings as to any harm to the children and without a plenary hearing"; he granted temporary custody of both children to McComb, and further ordered that Graf would have "[n]o parenting time/visitation until further ordered."  *Id.* at ¶¶ 86-87.  Graf alleges that although he was notified of the TRO on January 9, it required him to find alternative living arrangements which, in addition to his work obligations, left Graf with no time to prepare or obtain counsel for the hearing on the permanent, final restraining order, which was originally scheduled for January 11, 2012.  *Id.* at ¶ 88.

"Although Graf wanted to resolve the issue on the 11th, the Court correctly cited the lack of time to prepare and opposing counsel agreed that additional time should be granted."  *Id.* at ¶ 90.  During the interim time period, Graf was ordered not to have any contact whatsoever (including indirect communications as well as phone or email) with his two daughters, and grandparents and friends of Graf were restricted from all contact.  *Id.* at ¶ 89.

On February 10, 2012, Judge Massi issued a Consent Order, "without a plenary hearing and without making any finding with respect to the children "turned a 'temporary' denial of parental rights[] into an indefinite denial of parental rights," by permitting ten hours of Supervised parenting time for Graf on February 12, but otherwise ordering that all other terms of the January 9th Order remained in effect, including denial of any "parenting time/visitation" with Graf's children. *Id.* at ¶¶ 91-92. Graf alleges that he consented to this Order in order to see his children, whom he had not seen in a month. *Id.* at ¶ 92.

On March 22, 2012, after "repetitive appeals" to Judge Massi, Graf alleges he was permitted to have custody/parenting time every other weekend, subject to the availability of supervisors approved by the Court. *Id.* at ¶ 94. Graf also alleges that he was "permitted periodic phone contact and only supervised visitation the weekends of March 30, April 13, and April 27, 2012," and that on April 23, 2012, Judge Massi signed an Order Amending Temporary Restraints which permitted telephonic or Skype contact between Graf and his daughters twice a week, but otherwise continued severe restrictions on his parenting time and requiring all visitation to be supervised. *Id.* at ¶¶ 95-96.

Graf alleges that he refused to settle with McComb and that the TRO was dismissed with prejudice in August 2012. *Id.* at ¶¶ 98-99. In September 2012, Graf alleges a "50-50 custody agreement [was] finally struck." *Id.* at ¶ 100.

### v.  Karl Hagberg

Karl Hagberg is the father of minor children, E.H, (born 2003), A.H. (born 2005) and C.H. (born 2008). *Id.* at ¶¶ 7, 104. He is employed by Currents Magazine. *Id.* at ¶¶ 7, 105. In June 2014, Anna Hagberg ("Anna"), Hagberg's estranged wife, accused Hagberg of hitting one of his children. *Id.* at ¶¶ 104, 06. Anna subsequently filed an Order to Show Cause demanding that

13

Hagberg's custody be terminated. *Id.* at ¶ 107.  On August 14, 2014, Judge Jones entered an order, without conducting a plenary hearing, which denied Anna's motion to be granted full legal and residential custody, but also "significantly reduced the parenting time/physical custody permitted to Mr. Hagberg." *Id.* at ¶¶ 107-08.  Hagberg alleges that "the Court apparently concluded that even if the allegation that Hagberg had hit one of his children were true it would not justify a total loss of custody, however, the Court apparently concluded that a substantial reduction in parenting time was justified by the unsubstantiated allegation." *Id.* at ¶ 108; *see also id.* at ¶ 112 ("Hagberg has never had a plenary hearing, and the court has not been presented with any actual evidence of abuse or neglect. Judge Jones appears to be denying Hagberg significant time with his children based on generalize[d] and unsubstantiated concerns about his parenting.").  On September 17, 2014, Judge Jones signed an Order expanding Hagberg's parenting time, but did not order equal parenting time. *Id.* at ¶ 110.

Hagberg also alleges that, on August 5, 2015, Judge Ford conducted an *ex parte* proceeding, pursuant to an Order to Show Cause, and entered an order stating:  "Defendant father's parenting time with the three (3) children minor children shall be suspended until further Order of the Court." *Id.* at ¶ 113.  Hagberg asserts that no plenary hearing was held, Hagberg was not afforded an opportunity to respond, and the August 5 order was entered "without any finding of abuse or neglect by H[a]gberg." *Id.* at ¶ 114.  Hagberg also asserts that, although Judge Ford scheduled "further argument" on August 21, 2015, she did not hold an evidentiary hearing. *Id.* at ¶ 115.

### vi.   Clifton Hill

Clifton Hill is the father of the minor child A.H., who was born in 2010. *Id.* at ¶¶ 8, 119. In 2013, Hill and his estranged wife, Jennifer Russel, formally filed for divorce. *Id.* at ¶¶ 119-20.

14

In June 2013, Hill petitioned the court to allow him unsupervised parenting time with A.H. while the divorce litigation was pending. *Id.* at ¶ 121. In an Order dated June 14, 2013, Judge Delaney denied Hill's request without conducting a plenary hearing. *Id.* at ¶ 122.

In September 2013, Hill filed a motion to enforce litigants rights demanding that Russell be sanctioned for refusing to participate in reunification therapy -- the only contact allowed by Judge Delaney's June 14th Order -- and also demanding that the court allow him physical custody of A.H. *Id.* at ¶¶ 123-25. On October 18, 2013, Judge Delaney denied Hill's request for custody and for sanctions against Russell, but granted the motion to enforce litigants' rights and ordered that Russell comply with the prior order for reunification therapy. *Id.* at ¶¶ 126-27. Hill alleges, again, that no plenary hearing was held. *Id.* at ¶ 128.

Hill alleges that, due to false criminal allegations Russell made against him "[d]uring this time," he lost his job and has incurred several financial difficulties. *Id.* at ¶¶ 129-31. As a result of "[b]eing unemployed and faced with borrowing money to make child support payment[s] he could not afford, Hill was unable to afford an attorney to assist him, and he was appearing *pro se*." *Id.* at ¶ 132.

In April 2014, Hill alleges Judge Schweitzer suspended the "reunification therapy" visits as a result of an application for a TRO filed by Russell. *Id.* at ¶ 133. Although the TRO was dismissed, Hill alleges that Russell continued to refuse to participate in "reunification therapy" and that Russell applied to have the therapy terminated. *Id.* at ¶ 134.

On October 23, 2014, without conducting a plenary hearing, Judge Schweitzer entered an Order which terminated all parenting time between Hill and A.H. indefinitely until Hill "complete[d] parenting classes with a licensed psychologist" and submitted the psychologist's report to the Court. *Id.* at ¶¶ 136-38.

In early 2015, Hill alleges that he filed a motion with the court to allow him parenting time, and requested a plenary hearing. *Id.* at ¶ 140. On March 5, 2015, Judge Chell entered and order and statement of reasons denying Hill's motion, holding (1) that Hill could not see A.H. until he demonstrated "changed circumstances" by completing the parenting classes with a licensed psychologist, (2) that Hill had not demonstrated that a change in custody was in the best interests of the child, and (3) limited Hill's contact with A.H. to one phone call per week. *Id.* at ¶¶ 141-43. Hill alleges that "Judge Chell made no findings that Hill was an unfit parent, and no plenary hearing has ever been conducted." *Id.* at ¶ 144.

Hill alleges that the orders of Judges Delany, Chell, and Schweitzer "have severely restricted his fundamental, constitutional rights without justification and without any apparent standard being applied in violation of the Fourteenth Amendment." *Id.* at ¶¶ 147-50.

### vii. Samir Joshi

Samir Joshi is the father of two minor children J.J. and J.J. *Id.* at ¶¶ 10, 151. Joshi and his former wife, Christine Joshi, were married and then divorced in Pennsylvania, but on June 22, 2012, Christine filed an Order to Show Cause in New Jersey Superior Court, Burlington County seeking to have New Jersey "take jurisdiction." *Id.* at ¶¶ 151-52. Joshi alleges that he was not properly served with the Order to Show Cause and did not appear for this proceeding. *Id.* at ¶ 152. Joshi alleges that his ex-wife gave testimony at the hearing "based largely on hearsay evidence," after which "Judge Janet Smith signed an Order directing that Joshi hand over physical custody of the children to Christine immediately and Ordered he was not to take the children outside of New Jersey," Judge Smith set a return date on the Order to Show Cause for July 12, 2012. *Id.* at ¶¶ 153-54.

Joshi alleges that he did not receive notice of the July 12 proceeding "until a few days before the hearing." *Id.* at ¶ 155.  He further alleges that he requested a continuance from the court due to the recent death of his father, but the request was denied.  *Id.* at ¶¶ 155-56.  At the July 12 proceeding, Joshi claims that he was not allowed to cross-examine his ex-wife and that, due to the short notice and the death in his family, he "did not have time to prepare evidence to submit, nor obtain counsel." *Id.* at ¶ 157.

On July 12, 2012, Judge Smith entered an order which required Joshi to hand over physical custody of the children and "suspended parenting time until [Joshi] provides assurance that he will return the parties' children, and the Court issues another order." *Id.* at ¶ 158.

Joshi requested that the July 12 Order be "revised to give him full and equal custody, or in the alternative, at least parenting time each weekend." *Id.* at ¶ 159.  In an Order dated December 4, 2012, Judge Garenger denied Joshi's requests, without a plenary hearing, and "slightly modified the earlier Order but only permitted 'supervised visitation through the Burlington County Supervised Visitation Program.'" *Id.* at ¶¶ 160-61.

In the summer of 2013, Joshi again demanded full and equal custody, and requested a full plenary hearing.  *Id.* at ¶ 162.  In an Order dated July 26, 2013, Judge Garenger denied Joshi's request for a plenary hearing and granted limited parenting time to Joshi.  *Id.* at ¶ 162.

### viii.   Carly Olivier

Carly Olivier is the father of the minor child M.O., who was born in 2006.  *Id.* at ¶¶ 12, 203.  Olivier alleges that in January of 2014, Lisa Jenkins, M.O.'s mother, "filed an Order to show cause accusing Olivier of physically abusing their daughter." *Id.* at ¶¶ 203-04.  On February 21, 2014, Judge Lisboa signed an Order, without conducting a plenary hearing, that limited Olivier's parenting time with his daughter to one supervised visitation per week, supervised at the Hudson

County Courthouse, and required Olivier and Jenkins to "comply with all DYFS recommendations." *Id.* at ¶¶ 205-09. Olivier was not represented by counsel at the hearing, which he alleges he "could not afford." *Id.* at ¶ 208.

On August 7, 2014 Olivier appeared in court for Judge Lisboa to "review the case," where he acknowledged he was not complying with the DYFS recommendations because he did not believe they were correct. *Id.* at ¶¶ 213-14. Olivier alleges that Judge Lisboa told him "You're going to have to dig in your own pocket and hire your own doctor to present to this court that Dr. Figerelli [the DYFS expert] has made a mistake," and that Olivier stated he could not afford to hire his own expert. *Id.* at ¶ 215. Olivier also alleges that a representative from DCP&P was on the phone, and indicated that there were no abuse and neglect concerns, but Olivier was not permitted to cross examine this person. *Id.* at ¶ 216. Olivier alleges that, "[d]espite there not being any issues of abuse or neglect Judge Lisboa . . . told Olivier on the record, 'You are not going to see the child until you comply with all these other things.'" *Id.* at ¶ 218. Olivier alleges that Judge Lisboa entered an Order which stated: "The visitation is suspended until further order of the court and DCP&P will close their case." *Id.* at ¶ 219. Olivier alleges he then contacted DCP&P to participate in the "recommended" programs, but that he could not do so because "DCP&P had closed the case they no longer could provide any services to Olivier." *Id.* at ¶ 220.

Olivier alleges that "[d]espite the acknowledgment that there was "no child abuse or neglect" and without a plenary hearing, and without benefit of counsel, or the ability to present evidence, Olivier's parenting time has been terminated by Judge Lisboa" and that "Olivier's right to the care and custody of his daughter has been terminated permanently due to his inability to afford, and the State's refusal to provide, 'recommended' programs." *Id.* at ¶¶ 223-24.

        ix.      **Zia Shaikh**

Zia Shaikh is the father of the minor children M.S. (born 2000), S.S. (born 2003, and H.S. (born 2007).  *Id.* at ¶¶ 14, 239.  In October 2013, Mr. Shaikh filed for divorce from his wife Laura Germandig-Shaikh ("Germandig").  *Id.* at ¶ 240.  On January 18, 2014, Germandig filed for a TRO against Shaikh, which was dismissed after a hearing on January 31, 2014.  *Id.* at ¶ 241.  Although Shaikh alleges that the court ruled "that nothing in the testimony of Germandig alleged domestic violence or alleged anything more than an argument typical of a failing marriage[,] [n]evertheless, as a result of the TRO Shaikh was made to vacate his house."  *Id.* at ¶ 241.

On April 2, 2014, Shaikh alleges that Germandig "filed a motion in the family court requesting that Shaikh again be evicted and excluded from the family residence and demanding full custody of the children," with a return date of May 2, 2014.  *Id.* at ¶ 242.  On April 23, 2014, Judge Einbinder held a case management conference, which Shaikh alleges he was not notified of, and "for reasons which remain unclear, Shaikh's counsel did not attend."  *Id.* at ¶ 243.  Shaikh further alleges that "[t]he Court attempted to call Shaikh's counsel that morning but she could not be reached, and the voice mailbox was full."  *Id.* at ¶ 244.   Shaikh alleges that at this conference, Germandig's counsel made an oral request for an Order to Show Cause to award exclusive custody of the children to Germandig, and submitted an affidavit in which she accused Shaikh of "verbal harassment" and also claimed that Shaikh had "kicked" his daughter sometime in February.  *Id.* at ¶ 245.  Although Germandig was present and placed under oath, Shaikh alleges she was not asked any questions about these allegations, but only questioned about her telephone account.  *Id.* at ¶¶ 246-47.

Judge Einbinder allegedly granted the oral, *ex parte* request for an Order to Show Cause and, in a written order dated April 23, awarded Germandig "sole, legal and residential custody of the children," stripped Shaikh of legal and physical custody indefinitely until "further order of the

19

Court," and "barred [him] from returning to the residence." *Id.* at ¶ 248. The April 23 Order made no provision for parenting time, and provided "no explanation for the decision to strip Shaikh of custody and no plenary hearing has ever been held." *Id.* at ¶ 249. Shaikh also alleges that Judge Einbinder did not make any explicit fact findings or conclusions of law, but rather that Judge Einbinder stated, without any factual basis, "there is a concern that the Court that Mr. Shaikh may try to take the children. So I do feel that it rises to the level of immediate and irreparable harm[.]" *Id.* at ¶ 250.

On June 13, 2014, Judge Einbinder heard oral argument on the motion, but did not hold a plenary hearing. *Id.* at ¶ 251. Shaikh alleges he appeared *pro se* at this June 13 proceeding, "contradicted virtually all of Germandig's assertions," and denied allegations of child abuse. *Id.* at ¶ 251. On June 13, 2014, Judge Einbinder entered an order that Germandig continue to have "full legal and physical custody," directed that all parenting time of Shaikh with his daughter M.S. was suspended indefinitely, and provided for two visits each week with the other two children, but no overnights. *Id.* at ¶ 252. Judge Eindbinder also ordered Shaikh and Germandig to mediate the issue of parenting time, and ordered a "variety of other things," including "requiring Shaikh to attend anger management, make various financial payments and requiring him to turn over a variety of documents including his passport." *Id.* at ¶¶ 253-54.

On August 29, 2014, Judge Einbinder ordered that all Shaikh's parenting time with his children was suspended until further notice because Shaikh had failed to comply with her earlier Order. *Id.* at ¶ 255. Shaikh alleges that this suspension of parenting time "appears to have been based on unsubstantiated allegations that Shaikh was going to flee the country" and "[t]he denial of parenting time also appears to have been intended to 'punish' Shaikh for failing to comply with these court orders." *Id.* at ¶ 256. On December 12, 2014, Judge Einbinder denied Shaikh's

requests for joint legal custody, stating that Shaikh had not shown changed circumstances.  *Id.* at ¶ 260.

### B.    Additional Claims of Surender Malhan, Anthony Quinlan, and Karl Hagberg

Surender Malhan and Anthony Quinlan's claims concerning their custody hearings were previously dismissed by the Court, with prejudice, as barred by the statute of limitations.  Unlike Graf, neither Malhan nor Quinlan have amended their allegations to include claims concerning their custody hearings that would not be barred by the statute of limitations, and the facts underlying those claims, originally set forth in this Court's prior opinion, will not be repeated here.

Both Malhan and Quinlan also asserted claims concerning (1) a gag order entered against Malhan and (2) a weapons order entered against Quinlan.  The Court previously dismissed these claims, without prejudice, based on Plaintiffs' failure to plead how any of the actions of the individual defendants, sued under a theory of *respondeat superior*, caused these plaintiffs harm.  Subsequently, Plaintiffs filed the Second Amended Complaint in an attempt to cure the defects in their pleadings.

With respect to Malhan's "gag order," Plaintiffs now allege that on or about February 18, 2014, a television news reporter interviewed Malhan and two other plaintiffs in the instant suit about their experiences in family court and their complaints about constitutional deprivations.  *Id.* at ¶ 194.  On February 4, 2014, Judge Nanci Sivilli issued a "gag order" restraining Malhan from (1) discussing any issues surrounding the divorce or custody proceedings with any employee of any media (2) posting anything on the internet discussing these issues, (3) discussing any aspect of the divorce litigation with his children, and that (4) "[t]he Gag Order further restrains Malhan from discussing <u>this case</u> with one of his co-[plaintiffs], Karl Hagberg, who is an employee of Currents Magazine."  *Id.* at ¶¶ 195-97 (emphasis in original).  Malhan alleges that Judge Sivilli

did not hold a plenary hearing and "made no findings whatsoever specific to Malhan or his children," but rather "'found' that publicity about divorce proceedings was not in the best interests of the children." Sec. Am. Compl. ¶¶ 198-99. In addition to Malhan's challenge to the gag order in No. 14-0760, Hagberg has also challenged Malhan's gag order in No. 15-3519, alleging that "[t]he Gag Order further restrains Malhan from discussing his federal case with one of his co-defendants, Karl Hagberg, who is an employee of Currents Magazine" and that "[b]ecause Hagberg is an employee of currents Magazine the Gag Order prevents him from even discussing the ongoing constitutional violations with Mr. Malhan." *See* No. 15-3519 Compl. ¶¶ 81, 83 (emphasis in original); *see also id.* at ¶¶ 79-83, 253, 255. Plaintiffs allege that sometime after issuing the "gag order," Judge Sivilli recused herself, but did not vacate the order. *Id.* at ¶ 12.

With respect to Quinlan's weapons order, the Second Amended Complaint now alleges that Judge Maureen Sogliuzzo entered a custody order in December 2010, but the Second Amended Complaint continues to fail to identify (1) when the weapons order was entered and (2) which judge entered the weapons order. Quinlan's allegations, as they relate to the weapons order, are:

> Further, the Court denied and continues to deny Quinlan due process and his Second Amendment rights by ordering him not to possess any weapons. The Court issued this Order without any type of hearing on the issue or any showing that Quinlan's possession of weapons presented a danger. Thus Quinlan demands a declaratory and injunctive relief that the State and county may not deprive a person the fundamental right to keep and bear arms without showing the Order is necessary on a case by case basis, and the Order is at the very least narrowly tailored to an important state interest.

Sec. Am. Compl. ¶ 238.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted." When reviewing a motion to dismiss,

courts must first separate the factual and legal elements of the claims, and accept all of the well-pleaded facts as true.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  All reasonable inferences must be made in the plaintiff's favor.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).  In order to survive a motion to dismiss, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This standard requires the plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully," but does not create as high of a standard as to be a "probability requirement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Third Circuit requires a three-step analysis to meet the plausibility standard mandated by *Twombly* and *Iqbal*.  First, the court should "outline the elements a plaintiff must plead to a state a claim for relief."  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).  Next, the court should "peel away" legal conclusions that are not entitled to the assumption of truth.  *Id.*; *see also Iqbal*, 556 U.S. at 678-79 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  It is well established that a proper complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted).  Finally, the court should assume the veracity of all well-pled factual allegations, and then "determine whether they plausibly give rise to an entitlement to relief."  *Bistrian*, 696 F.3d at 365 (quoting *Iqbal*, 556 U.S. at 679).  A claim is facially plausible when there is sufficient factual content to draw a "reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  The third step of the analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

Generally, when determining a motion under Rule 12(b)(6), the court may only consider the complaint and its attached exhibits.  However, while "a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 342 (3d Cir. 2004) (citation omitted); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

## III.    DISCUSSION

In Count I of the Second Amended Complaint, Plaintiffs seek a declaration that Defendant Judges have deprived Plaintiffs of their fundamental rights to care, custody, and control of their minor children without due process, specifically, without affording them adequate notice, "discovery and courtroom procedures," the right to counsel, the right to cross examine accusers, and the right to present evidence in one's defense, and by employing the "preponderance of the evidence" standard (or no standard at all).  Plaintiffs also request injunctive relief.

In Count II of the Second Amended Complaint, Plaintiffs seek a declaration that the use of the "Best Interests" and "preponderance of the evidence" standards as a basis for suspending or terminating parental rights and other fundamental rights is unconstitutional.  Plaintiffs also request injunctive relief.

In Count III of the Second Amended Complaint, Plaintiffs seek a declaration that Defendant Judges violated the equal protection clause of the 14th Amendment by (1) requiring the State to show "extraordinary circumstances" when terminating the parental rights of a parent, but utilizing a lower standard (or no standard) when denying the custody rights of one parent in favor of another parent, and (2) by providing indigent parents who are accused by the State of abuse or neglect in a proceeding to terminate parental rights with a constitutional right to counsel, but not

providing the same right to indigent parents in the context of divorce proceedings or other inter-parent disputes that may result in a loss of custody.  Plaintiffs also request injunctive relief.

Finally, in Count IV of the Second Amended Complaint, Plaintiffs requests a declaration that their fundamental rights, including their First and Second Amendment rights, may not be taken away without due process merely because they are in a family court, and the court believes it is acting in the best interests of children.

### A.     Defendant Judges are Not the Appropriate Parties to Defend the Constitutionality of the Laws at Issue in these Matters.

Plaintiffs' claims, brought under Section 1983 and the Declaratory Judgment Act, seek declaratory and injunctive relief against Defendant Judges.  While the Supreme Court held in *Pulliam v. Allen*, 466 U.S. 522, 540-42 (1984) that judicial immunity is not a bar to claims for injunctive or declaratory relief under Section 1983, Congress amended Section 1983 in 1996, as part of the Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, 110 Stat. 3847 (1996), to provide that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."  *See Chadwick v. Court of Common Pleas*, 244 F. Appx. 451, 455 (3d Cir. 2007).  Thus, Section 1983 now provides, in relevant part:

> Every person who, under color of any statute . . . of any State, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in . . . [a] suit in equity . . . *except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable*.

(Emphasis added).  As the Third Circuit has explained, this amendment of Section 1983 "does not expressly authorize suits for declaratory relief against judges.  Instead, it implicitly recognizes that declaratory relief is available in some circumstances, and then limits the availability of injunctive

relief to circumstances in which declaratory relief is unavailable or inadequate." *Brandon E. ex rel. Listenbee v. Reynolds*, 201 F.3d 194, 197-98 (3d Cir. 2000); *see also Azubuko v. Royal*, 443 F.3d 302, 304 (3d Cir. 2006).

Since Plaintiffs do not allege that any of the Defendant Judges violated a declaratory decree, whether Plaintiffs can seek injunctive relief turns on whether declaratory relief is available in this matter.  As discussed in more detail below, with respect to Plaintiffs' claims concerning their custody hearings, declaratory relief is unavailable to Plaintiffs in this court and, therefore, Plaintiffs may only seek injunctive relief under Section 1983.

As the Third Circuit has recognized, the "seminal case on the subject" of "[d]etermining whether . . . declaratory relief is available" against judges named as defendants in a Section 1983 action is *In re Justices of The Supreme Court of Puerto Rico*, 695 F.2d 17 (1st Cir. 1982). *Reynolds*, 201 F.3d at 198.  In *In re Justices*, the Justices of the Puerto Rico Supreme Court were named as defendants in a lawsuit challenging the constitutionality of a statute requiring members of the bar to support the bar association through dues payments.  In dismissing the case against the Justices, the First Circuit held that a party who challenges a statute on constitutional grounds does not have legal interests adverse to judges who merely adjudicate claims under that statute; the theory underlying that obvious tenet is that judges in such a position "sit as arbiters without a personal or institutional stake on either side of the constitutional controversy."  695 F.2d at 21. The First Circuit further reasoned that because judges typically have no role in a statute's enactment, they have no personal stake in the outcome of the constitutional challenge.  *Id.*

As the Third Circuit has explained, the relevant inquiry to determine whether judicial defendants are the proper defendants[6] for declaratory relief under Section 1983 turns on whether the "judge acted as an adjudicator rather than an enforcer or administrator of a statute." *Reynolds*, 201 F.3d at 199. Here, Plaintiffs seek a declaration that the "best interests" standard applied by the Defendant Judges is an unconstitutional basis on which to deprive Plaintiffs of equal parenting time. Importantly, the "best interests of the child" standard is codified in a legislative enactment. *See Gubernat v. Deremer*, 140 N.J. 120, 139 (1995); *see also* N.J.S.A. 9:2-3, 9:2-4(c), 9:2-4a. Thus, the actions of the Defendant Judges in applying this standard to the Plaintiffs' custody disputes is in the nature of an adjudicative function.

Similarly, the fact that several of the "laws" concerning adequate notice, the right to counsel, and the right to a plenary hearing are not embodied in legislative enactments, but rather in court rules promulgated by the New Jersey Supreme Court and in binding judicial decisions from appellate courts interpreting the relevant constitutional provisions,[7] does not vest these Defendant trial court judges with any adversarial interest in defending the constitutionality of these rules of law. *See R.W.T. v. Dalton*, 712 F.2d 1225, 1233 (8th Cir.) ("Although the plaintiffs here characterize their attack as one upon the court's 'practice' rather than upon the constitutionality of the Missouri statutes or Supreme Court Rules, this distinction makes no difference to our analysis."), *cert. denied*, 464 U.S. 1009 (1983). The court rules and judicial interpretations at issue in these matters were not promulgated, or authored, by the Defendant Judges. *Cf. Supreme Court*

---

[6] The Third Circuit, and other Courts of Appeal, have opted not to rest their decisions on the basis of Article III standing, but have couched their analysis in terms of whether judges are "proper defendants" when they act as neutral arbiters. *See Reynolds*, 201 F.3d at 198-99 (citing cases).

[7] *See Parham v. Johnson*, 126 F.3d 454, 456 (3d Cir. 1997); N.J. Ct. R. 5:8-6; *Faucett v. Vasquez*, 411 N.J. Super. 108, 127-28 (App. Div. 2009), *certif. denied*, 203 N.J. 435 (2010); *Hand v. Hand*, 391 N.J. Super. 102, 105 (App. Div. 2007).

*of Virginia v. Consumers Union of Am., Inc.*, 446 U.S. 719 (1980) (permitting suit against judges to enjoin them from enforcing bar membership requirement the judges themselves promulgated in the form of court rules, which made their involvement in the litigation more direct and which gave them an institutional stake in the litigation's outcome). Therefore, the trial judges who did not promulgate these court rules or hand down these controlling precedents, but who merely adhere to and apply these legal authorities in the matters before them, function as adjudicators.

Moreover, this Court shares in the comity concerns, identified by the First Circuit, necessarily implicated in requiring judges, named as defendants, to assume the roles of "advocates or partisans" in federal court to defend the state laws and rules they are charged to neutrally apply:

> To require the Justices unnecessarily to assume the role of advocates or partisans on these issues would tend to undermine their role as judges. To encourage or even force them to participate as defendants in a federal suit attacking Commonwealth laws would be to require them to abandon their neutrality and defend as constitutional the very laws that the plaintiffs insist are unconstitutional -- laws as to which their judicial responsibilities place them in a neutral posture. Indeed, a public perception of partiality might well remain even were the Justices to take no active part in the litigation. The result risks harm to the court's stance of institutional neutrality -- a harm that appeal would come too late to repair.

*In re Justices*, 695 F.2d at 25.

In short, Defendant Judges are not the proper defendants for Plaintiffs' request for declaratory relief, since they have no adversarial interest in defending the constitutionality of the laws they are charged with neutrally applying, and may continue to apply should they retain jurisdiction, in the custody hearings. The Defendant Judges acted as neutral arbiters[8] in the custody

---

[8] To the extent that Plaintiffs might take issue with the nomenclature used – neutral arbiter – because Plaintiffs may, in some instances, believe that one or more of the Defendant Judges harbored a bias against any of the Plaintiffs, the reference to "neutral arbiters" here simply describes the function of a judge who acts in an adjudicative role, rather than as an advocate or partisan with identifiable adversarial interests in the litigation before him or her.

proceedings, not as "enforcers" or "administrators" of a statute or court rule – which they themselves did not promulgate.

Since declaratory relief from Defendant Judges is not available to Plaintiffs, and they do not claim a declaratory decree was violated, Plaintiff's may seek injunctive relief under Section 1983. However, Plaintiffs' claims for injunctive relief must fail because Plaintiffs cannot demonstrate that they have no adequate remedy at law. *See N. Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306 (1984) ("A party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law.") (citing *Hillsborough v. Cromwell*, 326 U.S. 620, 622 (1946)). To the extent Plaintiffs perceive that they were aggrieved by the underlying custody decisions by the Defendant Judges, each Plaintiff had an available avenue of relief: to file an appeal with the Appellate Division of the Superior Court of New Jersey (and beyond). *Johnson v. N.J.*, 869 F. Supp. 289, 294 (D.N.J. 1994) (citing *Pulliam*, 466 U.S. at 541-42).

And that, of course, is the crux of this matter, at least insofar as it concerns the custody orders at issue here. The Court's decision today is not intended to downplay or denigrate the important rights that Plaintiffs allege have been violated – Plaintiffs merely have chosen the incorrect method for vindicating those rights. When a litigant believes that a judge, acting as a neutral arbiter, violates the litigant's constitutional rights or does not correctly apply the law, that litigant's method of recourse is clear: he or she should appeal the adverse decision, not collaterally attack it by way of an action against the trial judge under Section 1983. State courts are as competent as federal courts to address claims arising under the federal constitution. *See Rizzo v. Goode*, 423 U.S. 362, 380 (1976). As the Eighth Circuit has explained:

> Federal courts (except for the Supreme Court) are not superior to state courts, or higher in any theoretical order of precedence. Federal law is supreme and, if valid,

> supersedes state law no matter what court declares it. Federal law declared by a
> state court, for example, is supreme over state law declared by a federal court. It is
> not the forum that counts, but the law-making authority. Making state judges
> defendants in a federal court unnecessarily undermines this cornerstone of our
> federal system.

*Dalton*, 712 F.2d at 1233 (internal quotation marks and citation omitted).

Indeed, although "custody orders are always subject to change" in New Jersey, *Kiernan v. Kiernan*, 355 N.J. Super. 89, 93 (App. Div. 2002), they are deemed final for purposes of appeal. N.J. Ct. Rules 2:2-3; 5:8-6. Thus, since Plaintiffs could have, and may in the future, appeal to the state appellate courts, the New Jersey Supreme Court, and even the Supreme Court of the United States, any custody order they believe is entered in violation of their rights, whatever they imagine those rights are or should be, they have not shown that they have no adequate remedy at all, and their request for injunctive relief against Defendant Judges must be dismissed.

### B.   Malhan's Gag Order & Quinlan's Weapons Order

The same analysis set forth above holds true for Malhan's claims regarding Judge Sivilli's gag order and Quinlan's claim regarding the weapons order entered by an unidentified judge.[9] These orders were entered by judges presiding over Plaintiffs' custody matters in an adjudicative capacity and, therefore, they are not proper defendants for Plaintiffs' claims seeking declaratory relief. Nor can Plaintiffs' claims for injunctive relief succeed, since Plaintiffs could have appealed these orders either by seeking interlocutory review or filing notices of appeal when the orders became final.[10]

---

[9] The Court notes that, no matter which judge entered the weapons order, the analysis would not change and, therefore, permitting Plaintiff Quinlan an opportunity to amend his complaint is not necessary because it would be futile. *See Shane v. Fauver*, 213 F.3d 113, 115-16 (3d Cir. 2000).

[10] The Court notes that, although Malhan has been denied interlocutory review of his gag order, his appeal rights have not been entirely extinguished.

These orders were not entered in matters where the Defendant Judges were empowered by statute to exercise administrative, executive, or legislative functions. *Cf. Wolfe v. Strankman*, 392 F.3d 358 (9th Cir. 2004) (holding that Chief Justice was a proper defendant in a Section 1983 claim challenging the constitutionality of a vexatious litigation statute because of his role as chair of the Judicial Council of California, which maintained and disseminated the list of vexatious litigants); *Georgevich v. Strauss*, 772 F.2d 1078 (3d Cir. 1985) (en banc) (holding that class of prisoners properly sued defendant judges who administered the parole power), *cert. denied*, 475 U.S. 1028 (1986). Where a judge issues an order in a matter she presides over as a neutral arbiter, her drafting of that order is not a "legislative" function, and her ability to "enforce" that order does not transform the judge into an executive officer or a party with an adverse interest to the litigant to which the order applies. *See Nollet v. Justices of the Trial Court*, 83 F. Supp. 2d 204, 211 (D. Mass.) (holding that judges who "fashion[] the conditions of both temporary and permanent restraining orders . . . are not acting in either an enforcement, administrative, or legislative capacity when they consider the merits of" the petition for the restraining order), *aff'd*, 248 F.3d 1127 (1st Cir. 2000). As the First Circuit succinctly explained by way of analogy in *In re Justices*: "In short, § 1983 does not provide relief against judges acting purely in their adjudicative capacity, any more than say, a typical state's libel law imposes liability on a postal carrier telephone company for simply conveying a libelous message." 695 F.2d at 22.

In opposition to the motions to dismiss, Plaintiffs cite to of *Nichols v. Sivilli*, No. 14-3821, 2014 U.S. Dist. LEXIS 175391 (D.N.J. Dec. 19, 2014), in which another district court in New Jersey considered a challenge – to the same gag order at issue in this matter – by a news reporter who wished to interview Malhan. However, Plaintiffs' reliance on this unpublished decision is

misplaced.[11]   The court in *Nichols* distinguished *In re Justices*, arguably out of context,[12] to determine that Article III standing existed between the plaintiff – who was not a party to the custody matter in which the gag order was issued – and Judge Sivilli because she had drafted the gag order herself and was empowered to enforce it.  *Id.* at *7-9.  However, the court in *Nichols* did not reach the issue of whether declaratory or injunctive relief was appropriate against Judge Sivilli. Instead, the court dismissed the claim for injunctive relief against Judge Sivilli without prejudice because the plaintiff "ha[d] not alleged in the [Second Amended Complaint] that declaratory relief is unavailable or inadequate."  *Id.* at *17.

Unlike the third-party reporter in Nichols, Malhan and Quinlan were parties to the litigation in which the gag and weapons orders were entered against them, respectively.  Plaintiffs' interpretation of Section 1983 – that any litigant aggrieved by any order of a trial court may file a complaint against the judge who issued it, merely because the judge could "enforce" his or her own order – would turn our court system completely on its head.  Indeed, if that were the rule, it is likely that federal district courts would be inundated with Section 1983 suits collaterally attacking judges' orders so as to avoid the more deferential review those orders might receive in appellate courts.  Instead, when a judge presiding over a case – and acting in an adjudicative capacity – has entered an order which a litigant believes violates his or her constitutional rights, or

---

[11] Moreover, the Court notes that it is not bound by the decisions of other district courts. *See Altana Pharma AG v. Teva Pharms. USA, Inc.*, No. 04-2355, 2013 U.S. Dist. LEXIS 74210, *19-20 (D.N.J. May 14, 2013); *Columbia Casualty Co. v. Statewide Hi-Way Safety, Inc.*, 94 F.R.D. 182, 184 (D.N.J. 1982).

[12] *See Reynolds*, 201 F.3d at 199 n.3 (noting that the First Circuit and "[t]he other courts of appeals addressing the issue have . . .  opted not to rest their decisions on the basis of Article III") (citing *Grant v. Johnson*, 15 F.3d 146, 148 (1994); *Dalton*, 712 F.2d at 1232-33; *Mendez v. Heller*, 380 F. Supp. 985, 990 (E.D.N.Y. 1974), *aff'd*, 530 F.2d 457 (2d. Cir. 1976)).

is otherwise incorrect or unjust, that litigant should either seek interlocutory review of the order or appeal the order when it becomes final.

Accordingly, Malhan's claim concerning his gag order and Quinlan's claim concerning his weapons order are dismissed with prejudice.

### C.    Hagberg's Challenge to the Malhan's Gag Order

The only claim that remains is Hagberg's challenge to Malhan's gag order, asserted in No. 15-3519 (to which Malhan is not a party).[13]  *See* No. 15-3519 Compl. ¶¶ 79-83, 253, 255.  Hagberg alleges that "[t]he Gag Order further restrains Malhan from discussing <u>his federal case</u> with one of his co-[plaintiffs], Karl Hagberg, who is an employee of Currents Magazine" and that "[b]ecause Hagberg is an employee of currents Magazine the Gag Order prevents him from even discussing the ongoing constitutional violations with Mr. Malhan."  *See* No. 15-3519 Compl. ¶¶ 81, 83 (emphasis in original); *see also id.* at ¶¶ 79-83, 253, 255.

However, the gag order does not specifically restrain Malhan from discussing "his federal case" or the "ongoing constitutional violations" with Hagberg insofar as Hagberg is a co-plaintiff in No. 14-0760.  Instead, the gag order enjoins Malhan from "speaking with, appearing for an interview, or otherwise discussing any of the parties, the parties' marriage, their pending divorce, the within litigation, or the parties' children with *any reporters, journalists, newscasters, or other agents/employees of newspapers or other media outlets on the grounds*."  Certification of Surender

---

[13] The Court notes that while the Second Amended Complaint in No. 14-0760 makes an oblique reference to the gag order restraining Hagberg's ability to speak to Malhan, *see* Second Amended Complaint ¶ 196, it only does so in a section entitled "Facts Relevant to Malhan," Indeed, on May 8, 2014, the Court abstained from addressing the gag order in No. 14-0760, despite noting that it raised "serious constitutional concerns," based on the *Rooker-Feldman* doctrine, and thus I will not address the gag order in the context of No. 14-0760.  *See* No. 14-0760, Dkt. No 8.

Malhan [hereinafter "Malhan Cert."] ¶ 3, Ex. A at ¶¶ 5-6 (emphasis added).[14]  Thus, to the extent that Hagberg challenges the gag order on the grounds that it enjoins Malhan from discussing the these matters with Hagberg as a co-plaintiff in No. 14-0760, that claim must fail because the gag order does not so provide.

The gag order does, however, appear to enjoin Malhan from discussing these matters with Hagberg in his capacity as an employee of *Currents* magazine.  "[T]hird parties have standing to challenge protective orders and confidentiality orders in an effort to obtain access to information or judicial proceedings." *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 838 (3d Cir. 1996) (quoting *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 777 (3d Cir. 1994)).  Third-parties seeking to challenge such orders do not lack standing merely because they assert rights that may belong to a broad portion of the public at large, so long as the "injury in fact" alleged by each third-party is "a distinct and palpable injury to himself," standing should not be denied "even if it is an injury shared by a large class of other possible litigants."  *United States v. Cianfrani*, 573 F.2d 835, 845-46 (3d Cir. 1978) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).  However, they must still show the "gag orders have caused them injury in fact and that their injury is likely to be redressed by a favorable decision," which includes a showing that "there is reason to believe that the individual subject to the gag order is willing to speak and is being restrained from doing so."  *FOCUS*, 75 F.3d at 838-39.

The parties have not addressed whether, despite having Article III standing to challenge the gag order, it is appropriate for Hagberg to bring a separate proceeding under Section 1983

---

[14] While generally a court may not consider matters outside the pleadings when ruling on a motion to dismiss, documents that are "integral to or explicitly relied upon in the complaint" may indeed be considered without converting a motion to dismiss into a motion for summary judgment. *Angstadt*, 377 F.3d at 342 (citation omitted).

against Judge Sivilli to challenge the gag order, rather than merely intervening in Malhan's custody proceeding.    Nor have the parties adequately addressed whether Judge Sivilli remains an appropriate defendant in this action, since she has recused herself from Malhan's custody case.[15]  *See* No. 15-3519 Compl. ¶ 12.  Accordingly, this Court will not address these issues at this time and this remains the only active claim in No. 15-3519.

**D.     Hagberg and Shaikh's Motion for a Preliminary Injunction.**

Since the Court grants Defendant Judges' cross-motion to dismiss in No. 14-0760, Plaintiffs Hagber and Shaikh's motion for a preliminary injunction in No. 14-0760 is denied as moot.  *See Camden Cnty. Recovery Coalition v. Camden City Bd. of Ed.*, 262 F. Supp. 2d 446, 448 (D.N.J. 2003).

## IV.    CONCLUSION

For the foregoing reasons, Defendant Judges' motion to dismiss in No. 14-0760 is granted and all of the claims asserted in that matter are dismissed with prejudice.  Defendant Judges' motion to dismiss in No. 15-3519 is granted in part and denied in part.  Specifically, all claims in No. 15-3519 are dismissed with prejudice except for Plaintiff Hagberg's challenge, as an employee of a media outlet, to the gag order entered by Judge Sivilli against Plaintiff Malhan, which remains the only active claim in this litigation.  Finally, Plaintiffs' motion for a preliminary injunction in No. 14-0760 is denied as moot.

/s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge

---

[15] Plaintiff Hagberg is directed to inform this Court within 10 days as to whether the gag order remains in effect, or has modified or vacated.

35